**2021 UT 44**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

GLENN CONWAY HUNTER,
*Petitioner.*

No. 20190882
Heard April 8, 2021
Filed August 12, 2021

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable William K. Kendall
No. 161401898

Attorneys:

Lori J. Seppi, Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., William Hains, Asst. Solic. Gen.,
Tony F. Graf, Salt Lake City, for respondent

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1    A jury convicted Glenn Hunter of distributing or arranging to distribute a controlled substance. Hunter says the police got the wrong man. He admits he possessed methamphetamine when police arrested him, but he says he's not the same man the police saw *distributing* methamphetamine.

¶2    Hunter's trial counsel presented a theory of mistaken identification in his opening and closing arguments, and he cross-examined the prosecution's witnesses about weaknesses, inconsistencies, and gaps in their testimony. But Hunter's trial

counsel did not request a jury instruction about the potential unreliability of eyewitness identification testimony—often referred to as a *Long* instruction. *See State v. Long*, 721 P.2d 483, 492–93 (Utah 1986).

¶3   On appeal, Hunter argued that his trial counsel's failure to request a *Long* instruction constituted ineffective assistance of counsel. The court of appeals affirmed the conviction, holding that Hunter's trial counsel was not deficient because court of appeals precedent held that *Long* does not apply to "real-time identifications" like the identification here.

¶4   We vacate the court of appeals' holding that *Long* does not apply. We nevertheless affirm because Hunter's trial counsel was not constitutionally deficient in not requesting a *Long* instruction. A competent attorney, on the facts of this case, could reasonably conclude that a *Long* instruction might backfire by causing the jury to think the officers' identification testimony was more reliable than they would otherwise think without the instruction.

## BACKGROUND

¶5   Two Salt Lake City police officers, Officers Willis and McNamee (collectively, Surveillance Officers), set up surveillance to look for drug activity near a downtown homeless shelter. The Surveillance Officers conducted their surveillance operation in two adjacent, second-story office rooms in a building "just over a hundred yards" from the shelter. The Surveillance Officers used binoculars to observe the goings on. It was around 7:30 p.m. on a summer's evening. Willis testified at trial that it was "fairly well lit outside" when they observed the drug sale at issue in this case. He also testified that there were no obstructions or weather conditions that impacted their ability to see.

¶6   At some point, the Surveillance Officers noticed what they described as a "White male wearing a white tank top, light colored pants," and with hair done in a bun. The Surveillance Officers testified that they saw the White male approach a "Black male" who was "leaning against" a wooden fence or wall. Hunter and the State agree that the back of the White man was to the Surveillance Officers, and the Black man faced the Surveillance Officers. Willis testified that he had never seen either man before. McNamee testified that the Black man was "a subject that appeared to be involved in narcotic—typical narcotic activity in the area."

¶7   McNamee recalled in his trial testimony that the "Black male [was] wearing sunglasses, a black hoodie, black T-shirt, he had

a yellow necklace on, and full length camouflage pants." McNamee also described seeing "the White male approach the other subject, they briefly contacted each other, and then the White male began walking [away]."

¶8    Willis, in his trial testimony, described the movements of the interaction with more specificity but did not, during that description, detail the Black man's appearance other than to note his perceived race and gender. Willis testified that he watched the White man (Buyer) hand cash to the Black man (Seller). The Seller took the cash and "retrieved from one of his pockets a clear . . . sandwich baggie" that "had some sort of a white substance in it." Willis watched the Seller reach into the bag, remove some of its contents with his hands, and distribute that into the Buyer's cupped hand. Willis further detailed that "it appeared . . . similar to if you had salt or some type of a substance like that in a plastic bag, and you tried to remove some and then give that to someone else in their hand without spilling it."

¶9    But when the prosecution asked if he could "actually see the hand motions through the binoculars," Willis did not directly answer yes or no. Instead he responded:

> [I]t was very obvious to me based on my life experience that what [the Seller] was doing was disbursing something that he had taken from the bag into the hand of the other male. The manner in which the White male was holding his hand, and the way that it was being disbursed was consistent with . . . I could say with confidence that he was -- it appeared to me he was . . . putting something into his hand.

During cross-examination, Willis similarly explained that the Seller "appeared to be retrieving [the substance] in a careful manner so as not to spill any" because, "based on my experience and training," "Never want to lose any of your suspected drugs."

¶10   Both Surveillance Officers spoke to the amount of time the transaction took. McNamee testified that the Buyer and Seller "briefly" contacted each other. Willis estimated that the total transaction took "[p]robably less than 20 seconds. . . . [I]t was quick, and most of the drug transactions in the area occur quickly like that." On cross-examination, Willis detailed that the pass of cash took "[p]robably a second or . . . two seconds" while the passing of the controlled substance "[t]ook a little bit longer," "maybe more like 10 seconds. Eight, 10 seconds, something like that."

¶11 Once the transaction was complete, the Surveillance Officers observed the Buyer walk away. Officer Willis then "immediately notified" the takedown officers that he believed he'd "just seen a drug transaction, and that the buyer was the White male in the white tank top with his hair up in a bun, and he was walking northbound." Willis described how the Buyer "couldn't go that far . . . before he was out of my view."

¶12 The prosecution asked Willis if he gave any description about the Seller to the takedown officers. Willis responded: "Probably not right at that time . . . . I wanted to get the description out of the White male as he was . . . walking north." McNamee, on the other hand, testified that after the Buyer walked away from the transaction, he provided the takedown officers with "the White male's description, and the description of the Black male that I had observed."

¶13 Regarding the Surveillance Officers' focus, McNamee testified: "I was continuing to watch the White male as he left the area. Once he left my view, I transitioned back to the other male that I'd watched," referring to the Seller. Willis, on the other hand, initially testified that the Seller remained in his view, but changed his tune somewhat on cross-examination. During direct examination, Willis explained that the reason he hadn't given the takedown officers a description of the Seller at the same times as he gave a description of the Buyer was that he "could still see [the Seller] in my view." Willis further explained that, while he was waiting for the takedown officers to apprehend and search the Buyer, he "just tried to maintain a visual observation of the Black male to make sure he didn't get out of our view." Willis also stated that the Seller "remained right here in the area . . . just right there in the same area where he was standing when I first saw him." And he recalled that the Seller was "just kind of loitering there, standing in the area . . . just kind of hanging around."

¶14 Willis's cross-examination testimony was less definitive. Defense counsel asked whether, after having watched the Buyer walk out of sight, Willis "returned [his] line of view to the area where the Black male was." Willis responded: "It was kind of all right there in the same area. I may have even kept a view of both of them." Defense counsel pressed: "[W]hat you're really saying is, you don't remember right now whether you watched both of them." Willis responded: "In my report, I noted that the White male walked north out of my view. When he was out of my view, I returned to watching the Black male. He was still in the same area where he was

when I last saw him." Defense counsel again pressed: "So to be clear, then, you took eyes off of the Black male and followed the White male, based on your report and your memory." Willis did not directly answer whether he kept his eyes on the Seller. Instead, Willis responded: "I know I followed the White male. Correct."

¶15 After Willis and McNamee notified the takedown officers that the Buyer was walking away, the takedown officers "[a]lmost immediately" radioed back "they had located the White male and had stopped him." And "[v]ery shortly after that," another officer radioed that he had found "a white substance in the hand of the White male."

¶16 Willis and McNamee then reported the suspected Seller's description and location. Willis testified that he told the takedown officers that "the suspected dealer, the Black male" was "by the ramp to the men's side of the shelter by the fence, and that he was wearing camouflage pants, a black hoodie type sweater, black sunglasses and a black hat, and he had a gold chain around his neck." On cross-examination, Willis added that he did not take note of any potential "distinctive markings" on the hoodie, and he agreed it was "not uncommon" for people in the area to wear hoodies and sunglasses. Willis also did not notice whether the suspected Seller's pants were "any specific or particular kind of camouflage," stating that it was "a basic camouflage that could be easily recognizable by most anyone."[1] Nor could Willis definitively say whether "no one else there was wearing camouflage pants." But he clarified that he "didn't see anyone else wearing camouflage pants that could've been confused with the pants that the suspect had on," so he "didn't feel that anything more than camouflage pants was needed to direct the officers to the appropriate suspect."

¶17 Willis's and McNamee's trial testimony describing the suspected Seller's "sunglasses" differed somewhat from that of one of the takedown officers. The takedown officer testified that he was not told to look for someone wearing sunglasses. Rather, "[t]he description [he] was given was a Black male in a black hooded sweater wearing camo pants and holding an orange sports drink." Another takedown officer testified that he was given a description of "a male, Black, with camouflage pants" and "there would've been a full clothing description."

---

[1] Thus defeating camouflage's purpose.

¶18 In addition, Willis testified that he had observed "quite a number of people" congregated near the shelter that day. Willis acknowledged during cross-examination that he "didn't take note" of the precise number of "Black people in that area that day," nor the precise number of people of other races or ethnicities. One of the takedown officers similarly could not recall whether there were Black people other than Hunter there that day, though he testified that the shelter area was "known" to have a large number of Black, Hispanic, and Asian people and that there were consistently people of "all races" there.[2]

¶19 After Willis and McNamee gave the takedown officers the description of the person they believed to be the Seller, they waited for the takedown officers to arrive. Willis testified that, while they waited, he was "able to remain in visual contact with the Black male during this time," and "was able to watch as the other officers arrived in the area, got out of their cars, and approached him, and was able to verify that they had contacted the correct male." McNamee similarly testified that he saw the takedown officers "come into the area and contact the subject that I had described and take him into custody." One of the takedown officers similarly verified that, once he placed the person suspected to be the Seller in handcuffs, he received "verbal confirmation," presumably from the Surveillance Officers, "that that was indeed the individual observed dealing the narcotics."

¶20 McNamee agreed with the prosecutor's clarification that, when he was talking about the person the takedown officers arrested, he was "talking about the Black male" that he had watched participate in the drug transaction, and that that man "was in that same area," when the takedown officers arrested him. Similarly, Willis testified during cross-examination that the Seller and the person arrested were the "same." Specifically, defense counsel asked whether, after the Buyer walked away, "[Willis] returned and viewed *a* Black male." (Emphasis added.) Willis responded that it was "[t]he *same* Black male." (Emphasis added.) And when further pressed, Willis again said, "It was the same Black male," and again that "[i]t was the same Black male that was wearing the hat, the sunglasses, the hoodie, the camouflage pants, and the gold chain . . . [t]hat was standing there when he made the transaction with the

---

[2] The record before us does not contain any evidence on the race or ethnicity of the Surveillance Officers and the takedown officers.

White male." On re-direct, Willis agreed twice with the prosecution that the arresting officers responded to "*the* Black male." (Emphasis added.) Finally, the prosecution asked Willis, "during the course of your investigation, were you able to determine the name of the Black male?" Willis said "Yes" and that his name was "Glen [sic] Hunter."

¶21 One of the takedown officers testified that when they apprehended Hunter, he was wearing a black hooded sweatshirt and camouflage pants. Hunter was also holding an orange sports drink. In addition, the takedown officer initially testified during cross-examination that Hunter was wearing what "appeared to be sunglasses" at the time of arrest. But he then agreed with defense counsel that Hunter's glasses at the time of arrest were the glasses he was wearing in court, which "look clear." However, the takedown officer reiterated that, "[f]rom what I observed on scene, they appeared to be sunglasses." The takedown officer did not recall finding any other pair of glasses during his search of Hunter.

¶22 The takedown officers did find other items during their search of Hunter. Specifically, the takedown officers found a "bag of a white crystal like substance," a firearm, and cash.

¶23 The state crime lab tested the white substances from both Hunter and the Buyer and determined the substances to be methamphetamine. But the crime lab witness acknowledged during cross-examination that the lab did not test the purity of the two samples to determine if they were the same or cut with different types or amounts of other substances.

¶24 The takedown officers recorded Hunter's arrest on body cameras. But Willis and McNamee did not record or photograph the alleged transaction between the Buyer and the Seller. No other image or recording of the transaction was introduced into evidence.

¶25 The State charged Hunter with second-degree felony distribution of or arranging to distribute a controlled substance.[3] At trial, Hunter's defense counsel argued that Hunter had been misidentified as the man involved in the drug transaction. He raised that point in opening and closing arguments. During opening

---

[3] The State also charged Hunter with purchase, transfer, possession or use of a firearm by restricted person, as well as possession or use of a controlled substance. At a preliminary hearing, the district court granted the State's motion to dismiss the controlled substance possession charge.

arguments, Hunter's trial counsel asked the jury to consider whether the evidence shows that Hunter was, in fact, the person who engaged in the exchange with the Buyer. During closing, he posited that "the officers took down the wrong person" and that the State had not proven Hunter was "the individual who distributed controlled substances."[4]

¶26 Hunter's counsel stressed in his closing argument that the Surveillance Officers didn't "stay focused" on the Seller and "took eyes off" him, instead following the Buyer before "turn[ing] back and . . . look[ing] at" the Seller. He also pointed out multiple times in his opening and closing arguments that, although the Surveillance Officers viewed the transaction through binoculars, it was "at some distance," and the Surveillance Officers had used their "personal binoculars," not government-issued ones. Moreover, Hunter's counsel pointed out that there were "multiple individuals present at that time milling about," including other Black people, according to photographs of the arrest. Yet, noted Hunter's counsel, the Officers could not recall whether there were other Black people in the area then. And Hunter's counsel reminded the jury during closing that the Surveillance Officers had not taken any photographs of the drug transaction.

¶27 In his closing arguments, Hunter's counsel also questioned whether the Surveillance Officers' description of the suspected Seller as a Black male in a hoodie, gold chain, sunglasses, and camouflage pants was "so unique" as to make an accurate identification, highlighting how the description included nothing about height, age, weight, size, body type, or distinctive markings. He also identified multiple discrepancies in the Surveillance Officers' descriptions of the suspected Seller, asserting that "there's no gold chain in evidence," nor are there sunglasses. And he pointed out in closing

---

[4] This argument also formed the basis of Hunter's motion for a directed verdict. In that motion, Hunter's counsel contended that Hunter was "different from the person that the officers were observing" during the drug transaction, that the State had presented insufficient evidence to prove Hunter "was the individual who distributed that methamphetamine," and that there was "clearly a break in the [S]tate's evidence" and only "pure speculation" could lead a jury to conclude that Hunter was "the individual who was observed doing the distribution of controlled substances."

that the Surveillance Officers did not describe the Seller as having an orange sports drink, yet Hunter had an orange sports drink in hand when arrested.

¶28 In addition, Hunter's counsel pointed out in his opening and closing arguments that the state crime lab had not conducted a purity test to determine whether the methamphetamine found on the Buyer was the same purity as the methamphetamine found on Hunter.

¶29 Hunter's trial counsel had evinced those details during his cross-examination of the Surveillance Officers, the takedown officers, and the state crime lab employee. As discussed above, Hunter's counsel pressed Officer Willis on whether or to what extent he took his eyes off the Seller while the Buyer was walking away. *See supra* ¶ 14. He also asked Willis about how much time the transaction took and how long he was able to observe the seller. *See supra* ¶ 10. He questioned Willis on whether there was anything more distinct about the Seller's clothing and accessories. *See supra* ¶ 16. And he pressed Willis on whether Hunter was the same Black man as the person observed selling the drugs. *See supra* ¶ 20. Hunter's counsel also pressed one of the takedown officers on whether the Surveillance Officers' description of the Seller included sunglasses and whether Hunter was indeed wearing sunglasses or clear glasses during arrest. *See supra* ¶¶ 17, 21. And, finally, Hunter's counsel questioned the crime lab personnel on why they did not conduct purity testing on the methamphetamine samples to determine if the methamphetamine found on the Buyer and Hunter were the same. *See supra* ¶ 23.

¶30 Although Hunter's trial counsel spent much of his arguments and cross-examination on his theory of mistaken identification and pointing out weaknesses in the witnesses' testimonies, he did not ask the judge to give the jury a *Long* instruction. A *Long* instruction educates and cautions a jury about the factors that might impact the reliability of eyewitness identifications. *See State v. Long*, 721 P.2d 483, 492–93 (Utah 1986). Hunter's counsel also did not call an eyewitness expert to educate the jury about the issues that can impact the quality of eyewitness identification.

¶31 Hunter's trial counsel did, however, request a jury instruction on the "Credibility of Witnesses," which included such questions as, "How good was the witness's opportunity to see, hear, or otherwise observe what the witness testified about?" And

whether the witness's testimony was "consistent over time," and "believable . . . in light of other evidence" and "in light of human experience." The judge gave the witness credibility instruction as part of the jury's preliminary instructions.

¶32 The jury instructions told jurors that "[t]here has been evidence suggesting that a person other than the defendant may have been involved in the crime for which the defendant is on trial," and reminded the jury that their duty is to decide whether the State has "proven, beyond a reasonable doubt, the guilt of the defendant who is on trial." The instructions also advised that "[t]he fact that a witness is employed in law enforcement does not mean that his testimony deserves more or less consideration than that of any other witness," and that it is up to the jurors "to give any witness's testimony whatever weight [the jurors] think it deserves." Further, the jury instructions included, at Hunter's request, an instruction on possession as a lesser-included offense of distribution.

¶33 The jury convicted Hunter of distributing or arranging to distribute a controlled substance.[5] Hunter appealed.

¶34 In the court of appeals, Hunter argued that his trial counsel's failure to request a *Long* instruction amounted to ineffective assistance of counsel. *State v. Hunter*, 2019 UT App 157, ¶ 9, 451 P.3d 272. He also challenged the sufficiency of the evidence on the distribution charge. *Id.* The court of appeals rejected both of Hunter's arguments and affirmed the conviction. *Id.* ¶ 21. The court held that the evidence was sufficient to support Hunter's conviction. *Id.* ¶¶ 16–21. And it held that Hunter's trial counsel was not deficient for failing to request a *Long* instruction because *Long* does not apply to "real-time identifications" like the officers' identifications here. *Id.* ¶¶ 14–15. To arrive at that conclusion, the court of appeals relied on *State v. Bowdrey*, 2019 UT App 3, 438 P.3d 946. The court reasoned that the Surveillance Officers' "contemporaneous identification of Hunter was nearly identical to the real-time identification of the defendant in *Bowdrey*," *Hunter*, 2019 UT App 157, ¶ 14, and that the

_____

[5] The jury also convicted Hunter of the firearm charge, after Hunter's trial counsel conceded his guilt on that charge during closing arguments. *State v. Hunter*, 2019 UT App 157, ¶¶ 7–8, 451 P.3d 272. The trial court sentenced Hunter to serve prison terms of one-to-fifteen years for each of the two charges, to run concurrent with each other.

Surveillance Officers' "momentary shift in focus while perceiving real-time events is not the type of memory-based eyewitness identification that the *Long* instruction addresses." *Id.*

¶35 Hunter petitioned for a writ of certiorari. Hunter seeks review of the court of appeals' decision that his trial counsel did not provide ineffective assistance when it failed to ask for a cautionary instruction relating to eyewitness identifications.[6] He did not ask us to review the court of appeals' sufficiency of evidence determination. We granted Hunter's petition.

## STANDARD OF REVIEW

¶36 "'On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law.' An ineffective assistance of counsel claim presents a question of law that we review for correctness." *State v. Scott*, 2020 UT 13, ¶ 27, 462 P.3d 350 (citations omitted).

## ANALYSIS

¶37 "The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of counsel." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Hunter argues that he was deprived of effective assistance of counsel when his trial attorney failed to request a cautionary jury instruction about the potential unreliability of eyewitness identification testimony—often referred to as a *Long* instruction. *See State v. Long,* 721 P.2d 483, 492–93 (Utah 1986).

¶38 "[W]e evaluate claims of ineffective assistance under the standard articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Ray*, 2020 UT 12, ¶ 24. "[W]e employ the two-part test *Strickland* established, which requires the defendant to show (1) that counsel's performance was *deficient* and (2) that the deficient performance *prejudiced* the defense." *State v. Gallegos*, 2020 UT 19, ¶ 33, 463 P.3d 641 (emphases added) (citations omitted) (internal quotation marks omitted).

---

[6] Specifically, we granted Hunter's Petition for Writ of Certiorari on the following issue: "Whether the Court of Appeals erred in concluding that Petitioner failed to demonstrate reversible error arising from his claim that his trial counsel had provided ineffective assistance by failing to seek a cautionary instruction relating to eyewitness identifications."

¶39 The court of appeals affirmed Hunter's conviction, deciding Hunter's ineffective assistance of counsel claim on the first prong of the *Strickland* test. *State v. Hunter*, 2019 UT App 157, ¶¶ 11, 21, 451 P.3d 272. The court held that Hunter's trial counsel was not deficient for failing to request a *Long* instruction because "*Long* doesn't apply to this case." *Id.* ¶ 12. Specifically, the court of appeals concluded that *Long* does not apply to "real-time identifications" and therefore counsel could not be deficient in failing to make a "futile" request for an inapplicable *Long* instruction. *Id.* ¶¶ 12, 14–15.

¶40 Hunter argues the court of appeals erred because, he contends, he would have been entitled to a *Long* instruction if his trial counsel had requested it. And he contends that it was deficient for Hunter's trial counsel to not request such an instruction, and that his counsel's failure to ask for one prejudiced his defense.

¶41 The State agrees with the court of appeals that *Long* doesn't apply to this case, and the State largely agrees with the court of appeals' rationale. But the State also advances an alternative argument that, even if *Long* were available to Hunter, his counsel was not deficient because a reasonable attorney could surmise that a *Long* instruction risked hurting his defense. The State also argues that Hunter was not prejudiced by his counsel's performance, even if it were deficient.

¶42 We vacate the court of appeals' holding that Hunter would not have been entitled to a *Long* instruction had his counsel requested one. But, because we agree with the State that a reasonable attorney could surmise that a *Long* instruction risked hurting his client's defense, we nevertheless affirm the court of appeals' conclusion that Hunter's counsel was not deficient.

## I. THE COURT OF APPEALS ERRED IN HOLDING THAT *LONG* DOES NOT APPLY TO REAL-TIME IDENTIFICATIONS

¶43 A *Long* instruction is a cautionary jury instruction about factors that can impact the accuracy or reliability of eyewitness identification testimony and human perception. *See State v. Long*, 721 P.2d 483, 492–93 (Utah 1986). The need for such an instruction stems from the fact that "jurors are, for the most part, unaware of the[] problems" inherent in human perception and eyewitness testimony. *Id.* at 490. "People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness." *Id.*; *see also State v. Clopten* (*Clopten I*), 2009 UT 84, ¶ 15, 223 P.3d 1103 ("[J]uries are

generally unaware of these deficiencies in human perception and memory and thus give great weight to eyewitness identifications."). Moreover, "juries seemed to be swayed the most by the confidence of an eyewitness, even though such confidence correlates only weakly with accuracy." *Clopten I*, 2009 UT 84, ¶ 15.

¶44 Trial courts must give a *Long* instruction whenever three elements are met: (1) "eyewitness identification is a central issue in a case"; (2) "such an instruction is requested by the defense"; and (3) the defense has not called an expert witness on eyewitness testimony. *See Long*, 721 P.2d at 492, *as modified by Clopten I*, 2009 UT 84, ¶ 34.

¶45 The court of appeals held that Hunter would not have been entitled to a *Long* instruction even if his trial counsel had asked for one because that court believes that *Long* applies only to "memory-based" identifications, not "real-time" identifications. *State v. Hunter*, 2019 UT App 157, ¶¶ 14–15, 451 P.3d 272. Therefore, the court continued, Hunter's counsel could not be deficient in failing to make a "futile" request for an inapplicable *Long* instruction. *Id.* ¶ 15.

¶46 The State urges us to affirm the court of appeals' holding and rationale. The State also offers two additional theories for why *Long* doesn't apply to Hunter's situation. The State posits that *Long* only applies to identifications based on facial recognition. The State further contends that the Surveillance Officers' testimonies here weren't "actual identification[s]" and "never identified Hunter as the seller."

¶47 Hunter, naturally, argues that the court of appeals and the State are incorrect on the applicability of *Long*. Hunter contends he would have been entitled to a *Long* instruction if his trial counsel had requested it.

¶48 For reasons discussed below, we agree with Hunter that the court of appeals and the State are incorrect in deeming *Long* inapplicable.[7]

---

[7] In 2019, after Hunter's trial was complete, we adopted rule 617 of the Utah Rules of Evidence to govern questions regarding the admissibility of eyewitness identification evidence. *See* UTAH R. EVID. 617(b). The rule also governs when a court may and must give a cautionary instruction. *Id.* 617(f). We therefore expect that rule 617 will answer most questions which previously would have been

(continued . . .)

### A. *Identifications Need Not Involve Long-Term Memory to Invoke* Long

¶49 We first vacate the court of appeals' holding that *Long* only applies to "memory-based" identifications, and not "real-time" identifications. *See Hunter*, 2019 UT App 157, ¶¶ 14–15. To reach that conclusion, the court of appeals relied upon its decision in *State v. Bowdrey*, 2019 UT App 3, 438 P.3d 946. In *Bowdrey*, the court of appeals held that "eyewitness identification based on *memory* is the key factor in *Long* and its progeny," *id.* ¶ 16, and that *Long* did not apply where an officer had "made a continuous, real-time observation of Bowdrey as he engaged in selling drugs and was subsequently detained by the Arrest Team," *id.* ¶ 15, and the officers had kept their eye on Bowdrey "the entire time." *Id.* ¶ 17.

¶50 The *Hunter* court analogized that the "real-time identification" in *Bowdrey* was "nearly identical" to the Surveillance Officers' "contemporaneous identification of Hunter." *Hunter*, 2019 UT App 157, ¶ 14. The court acknowledged that the Surveillance Officers "momentarily focused on Buyer as he left the scene." *Id.* But the court believed that the "Officers' fleeting focus on Buyer did not place their observation of Hunter's drug dealing in the realm of *Long*." *Id.* It reasoned that "a mere momentary shift in focus while perceiving real-time events is not the type of memory-based eyewitness identification that the *Long* instruction addresses." *Id.*

¶51 We disagree with the court of appeals. Although we discussed "memory" at length in *Long*, we did not limit the need for cautionary instructions to only those identifications involving longer-term memory as the court of appeals did in this case and in *Bowdrey*. Rather, *Long* focused on the "memory *process*," emphasizing that "[r]esearch on human memory has consistently shown that failures may occur and inaccuracies creep in at *any stage*

---

analyzed under *Long*. However, litigants might use *Long* and its progeny when arguing about the rule's applicability and reach. *See id.* 617(a)(1). Further, there may still be pending cases in which the court of appeals' *Long* analysis is a live issue. We therefore deem it prudent to reject the State's arguments on what constitutes an "eyewitness identification" meriting a cautionary instruction and correct the court of appeals' error so it does not improperly preclude future litigants from receiving cautionary instructions in appropriate cases.

of what is *broadly* referred to as the 'memory process.'" *Long*, 721 P.2d at 488 (emphases added). We explained that the stages of the memory process "include[] the acquisition of information, its storage, and its retrieval and communication to others." *Id.*

¶52 During the "acquisition stage" of the "memory process," a "wide array of factors" may "affect the accuracy of an individual's perception," including the observer's distance from the event, the length of time to perceive the event, the lighting, the amount of movement, and the witness's physical and emotional conditions. *Id.* at 488–89. The "acquisition stage" is also impacted by factors that are "unique to each observer, includ[ing] the expectations, personal experiences, biases, and prejudices brought by any individual to a given situation," as well as "the significance of the event to the witness at the time of perception." *Id.* at 489. Witnesses also have "unconscious strategies of selective perception" which "may result in the exclusion of information that will later prove important in a court proceeding." *Id.* "[T]he observer may have absolutely no memory of the facts simply because he or she failed to select the critical information for perception." *Id.*

¶53 The "retention stage" is "when information that may or may not have been accurately perceived is stored in the memory." *Id.* "Just as in the perception stage, where the mind infers what occurred from what was selected for perception, in the retention stage people tend to add extraneous details and to fill in memory gaps over time . . . ." *Id.* at 489–90. And, to be fair to the court of appeals, we did say "the length of time between the witness's experience and the recollection of that experience" can "affect the accuracy and completeness of recall." *Id.* at 489. But that does not negate that inaccuracies and imperceptions can occur "at any stage" of the "memory process." *Id.* at 488.

¶54 Finally, "the retrieval stage of the memory process" is "when the observer recalls the event and communicates that recollection to others." *Id.* at 490. This stage is "fraught with potential for distortion" for many reasons, including that "few individuals have such a mastery of language that they will not have some difficulty in communicating the details and nuances of the original event." *Id.* Research also shows that "the accuracy of an identification is, at times, inversely related to the confidence with

which it is made" or communicated. *Id.*; *see also Clopten I*, 2009 UT 84, ¶ 15 ("[C]onfidence correlates only weakly with accuracy.").[8]

¶55 The court of appeals failed to acknowledge *Long*'s attention to problems with *all* stages of the memory process, including the initial acquisition of information. Instead, the court of appeals' understanding of "memory" seems to be limited to the retention and retrieval stages of the memory process. The State, on the other hand, did acknowledge in its brief that "*Long* discussed potential problems not just with memory, but with perception as well." But the State failed to persuasively explain why *Long* instructions would be limited to applying only to memory-based identifications when *Long* was concerned with perception and acquisition of details right from

---

[8] Empirical research also supports *Long*'s concerns with the faults in eyewitness identifications from the very moment of intaking the details of an event. *See* Fredric D. Woocher, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 STAN. L. REV. 969, 976–82 (1977) (discussing how perception can be selective based on individual biases, stress, and poor observation conditions); Jacqueline Marks Bibicoff, *Seeing is Believing? The Need for Cautionary Jury Instructions on the Unreliability of Eyewitness Identification Testimony*, 11 SAN FERN. V. L. REV. 95, 99–101 (1983) (discussing factors that impact perception, such as stress, timing, lighting, and race); Robin Sanders, *Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards*, 12 AM. J. CRIM. L. 189, 194–96 (1984) (discussing factors that impact perception and selective memory, such as fear, personal bias, and race); Robert Buckhout, *Eyewitness Testimony*, 231 SCI. AM. 23 (1974), *reprinted in* 15 JURIMETRICS J. 171, 172–76 (1975) (outlining factors impacting the reliability of perception, including the importance of the event to the observer, length of observation, stress, distance and lighting, the observer's physical capacity to see, race, bias, and expectancy); Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 J. PERSONALITY & SOC. PSYCH. 1546, 1550–52 (1978) (discussing how preconceptions and race can impact the accuracy of the acquisition of details); I. Daniel Stewart, Jr., *Perception, Memory, and Hearsay: A Criticism of Present Law and the Proposed Federal Rules of Evidence*, 1970 UTAH L. REV. 1, 8–22 (detailing how perception and memory are impacted by neurological, psychological, and physiological factors).

the very start. The State only points out *Long*'s use of the term "memory process."

¶56  In sum, the court of appeals erred in holding that cautionary instructions are unwarranted unless the identification at issue involved "memory."

*B. Identifications Need Not Involve Facial*
*Recognition to Invoke* Long

¶57  The State urges us to narrow the applicability of cautionary instructions even more than the court of appeals did. The State posits that "*Long* and its progeny are limited to identifications based on *facial recognition*." And it asserts that the Surveillance Officers did not use facial recognition, so a request for a *Long* instruction would have been futile.

¶58 *Long* is not limited to identifications featuring facial recognition. The State even acknowledges as much. The State simply asserts that facial recognition is a "prominent[]" part of studies on eyewitness identification, but it acknowledges that those studies "do not focus exclusively on facial recognition." For example, one study cited in *Long* discusses not only issues with facial recognition, but also witnesses' "failure to observe the details of an event" due to "selective perceptual processes," including non-facial physical characteristics of a perpetrator. Fredric D. Woocher, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 STAN. L. REV. 969, 977 (1977). It laments that "even trained observers find it difficult to describe such obvious physical characteristics as height, weight and age." *Id.*

¶59 Further, as discussed above, *supra* ¶¶ 51–55, *Long* was concerned with the "process of perceiving events and remembering them," and how "failures may occur and inaccuracies creep in at any stage" of that process. *Long*, 721 P.2d at 488. "[T]he observer may have absolutely no memory of the facts simply because he or she failed to select the critical information for perception." *Id.* at 489.

¶60 Identifications primarily utilizing facial recognition may be more wrought with inaccuracies—particularly when they involve cross-racial identifications—and thus would more strongly merit a cautionary instruction. *See* Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 CORNELL L. REV. 934, 935–51 (1984); Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 ANN. REV. PSYCH. 277, 280–81 (2003). But facial recognition is not the only way to identify a perpetrator. Consider, for example, if a witness identified a perpetrator by the tattoos on his arms. That

identification would implicate the memory process and raise the same concerns *Long* identified. Even though the identification did not involve facial features, we would still want the jury to know about the factors that can impact a witness's recollection, including the witness's ability to view the actor during the event, the witness's degree of attention to the actor, and whether the identification was spontaneous and consistent, or the product of suggestion.[9]

¶61 Simply put, eyewitness identifications utilizing facial recognition are not the only kind of eyewitness identifications that can merit a cautionary instruction. *Long* does not require a facial recognition to warrant a cautionary instruction.[10]

### C. The Surveillance Officers Identified Hunter

¶62 The State's final push to constrict the applicability of cautionary instructions on eyewitness testimony asks us to conclude that the Surveillance Officers' testimonies here weren't "actual identification[s]" and "never identified Hunter as the seller." The State relies on *State v. Clopten* (*Clopten II*), where we said that the rules of admissibility of "eyewitness identifications" under another since-abrogated case, *Ramirez*, "appl[y] only when the state seeks to inform the jury that an eyewitness has recognized the defendant as the perpetrator." *Clopten II*, 2015 UT 82, ¶ 35, 362 P.3d 1216 (citing

---

[9] We note that Utah Rule of Evidence 617 does not limit itself to identifications involving facial recognition. *See* UTAH R. EVID. 617(a)(1). Nor, for that matter, does it exclude real-time identifications. *Id.* Rather, it defines "Eyewitness Identification[s]" as "witness testimony or conduct in a criminal trial that identifies the defendant as the person who committed a charged crime." *Id.* While rule 617 does not govern our analysis of Hunter's case, as we adopted that rule after completion of Hunter's trial, we nevertheless find rule 617 instructive and consistent with this court's thinking on eyewitness identifications and cautionary instructions under *Long* and its progeny.

[10] Even if cautionary instructions under *Long* were limited to identifications utilizing facial recognition, it's not clear that would help the State's argument. The State's brief asserts that the "seller was facing the officers." If that is true, it would seem that the Surveillance Officers' identification of Hunter did involve viewing faces, even though the description they gave to the takedown officers and at trial focused on Hunter's clothing and accessories.

*State v. Ramirez*, 817 P.2d 774 (Utah 1991), *abrogated by State v. Lujan*, 2020 UT 5, ¶ 4, 459 P.3d 992 (holding that the Utah Constitution does not mandate the factors used in *Ramirez* for assessing reliability and admissibility of eyewitness identification testimony, and that the rules of evidence are what apply)).

¶63 First, we are not convinced that *Clopten II* and *Ramirez* apply, as those cases involved the reliability of eyewitness identification testimony for the threshold purpose of admissibility, not whether a cautionary instruction is warranted after evidence is admitted. *Clopten II*, 2015 UT 82, ¶¶ 31–32; *Ramirez*, 817 P.2d at 778, 782. And, given our general rule to admit relevant evidence, *see* UTAH R. EVID. 402, it makes sense that we might have had a narrower understanding of what eyewitness identification testimony should be altogether excluded as compared to when admitted testimony merits a cautionary instruction.

¶64 Even if what we said in *Clopten II* did apply to this situation, the Surveillance Officers informed the jury multiple times that the man arrested—Hunter—was the person they saw selling the drugs. The State's assertions to the contrary are simply inconsistent with the record. At the time of Hunter's arrest, the takedown officer received a "verbal confirmation," impliedly from the Surveillance Officers, that the person they were arresting "was indeed the individual observed dealing the narcotics," according to the trial testimony of one of the takedown officers. *See supra* ¶ 19. Willis testified that he "watch[ed] as the other officers arrived in the area, got out of their cars, and approached him, and was able to verify that they had contacted the correct male." *See supra* ¶ 19. McNamee similarly testified that he saw the takedown officers "come into the area and contact the subject that I had described," referring to the Seller, "and take him into custody." *See supra* ¶ 19.

¶65 Further, Willis testified that the Seller and the person arrested were the "same." *See supra* ¶ 20. When pressed by defense counsel, he repeated two more times that it was "the same Black male." *Supra* ¶ 20. And again on re-direct, Willis agreed that the arresting officers responded to "the Black male" that had been involved in the drug transaction. *Supra* ¶ 20. Finally, the prosecution asked Willis if he was "able to determine the name of the Black male?" Willis responded, "Yes. . . . Glen [sic] Hunter." *Supra* ¶ 20.

¶66 The Surveillance Officers' identification of Hunter could not be much clearer. The State's argument that the Surveillance Officers

did not "identify" Hunter within the meaning of what merits a cautionary instruction, therefore, does not hold water.[11]

¶67 In sum, both the court of appeals and the State are incorrect in their assertions that *Long* is categorically and factually inapplicable to situations like Hunter's.[12]

## II. COUNSEL'S FAILURE TO REQUEST A *LONG* INSTRUCTION WAS NOT CONSTITUTIONALLY DEFICIENT

¶68 An attorney's performance is constitutionally deficient if "counsel's act or omission caused her representation to fall below an objective standard of reasonableness." *State v. Gallegos*, 2020 UT 19, ¶ 57, 463 P.3d 641. "If an attorney's decisions can be explained by a reasonable trial strategy, the defendant has necessarily failed to show deficient performance." *Id.* ¶ 56 (citing *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871; and *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The defendant has the burden to overcome a "strong presumption that counsel's conduct falls within the wide range of

---

[11] The State also attempts to support its theory with *Lujan*, 2020 UT 5. As with *Ramirez* and *Clopten II*, *see supra* ¶ 63, *Lujan* dealt with the *admissibility* of eyewitness identification testimony. *Lujan*, 2020 UT 5, ¶ 4. *Lujan* held that the rules of evidence, not the Utah Constitution, "prescribe the factors that trial courts should consider in judging the reliability and admissibility of eyewitness identification evidence." *Id.* Therefore, for the same reasons we are not convinced that *Ramirez* and *Clopten II* have much to tell us in this case, we are not convinced that *Lujan* applies here either. *See supra* ¶ 63.

[12] The State argues that mistaken identification was not a "central issue" in the case, which is one of the requirements for *Long* to apply. 721 P.2d at 492. We need not devote much airtime to that argument because it has no impact on our ultimate affirmance of Hunter's conviction and because we anticipate that future cases fighting over eyewitness identification evidence will be governed by rule 617, which does not include a "central issue" requirement. *See* UTAH R. EVID. 617(a)(1), (f). But we observe that Hunter's trial counsel discussed his theory that police had arrested the wrong person at-length in his opening statement, closing statement, and in a motion for directed verdict. *See supra* ¶¶ 25–32. Therefore, we agree with Hunter that mistaken identification was a "central issue" in his trial counsel's defense theory.

reasonable professional assistance." *Id.* ¶ 34 (citation omitted); *see also id.* ¶ 37. "[T]he question of deficient performance 'is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial.'" *Id.* ¶ 36 (citations omitted); *see also Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (quoting *Strickland*, 466 U.S. at 690)).

¶69 Hunter argues that his trial counsel was deficient for not requesting a *Long* instruction. While trial courts have "some latitude" to craft the content of each *Long* instruction, the instruction should address the following factors:

> (1) the opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*State v. Long*, 721 P.2d 483, 492–93 (Utah 1986). Further, "a proper instruction should sensitize the jury to the factors that empirical research have shown to be of importance in determining the accuracy of eyewitness identifications, especially those that laypersons most likely would not appreciate." *Id.* at 492. Factors impacting accuracy can include "the quality of the lighting and the time available for observation." *Id.* at 492–93; *see also State v. Clopten* (*Clopten I*), 2009 UT 84, ¶ 15, 223 P.3d 1103. It can also include the "use of a disguise, distinctiveness of the culprit's appearance, and the presence of a weapon or other distractions." *Clopten I*, 2009 UT 84, ¶ 15. In addition, "people identify members of their own race with greater accuracy than they do members of a different race." *Id.*; *see also Long*, 721 P.2d at 493.

¶70 Hunter argues that instructing the jury on these *Long* factors would have alerted the jury to weaknesses in the Surveillance Officers' testimony and, therefore, trial counsel was deficient for not requesting such an instruction.

¶71 To support his argument, Hunter invokes what we said in *State v. Maestas*—that "unless obvious tactical reasons exist to forego an instruction, trial counsel faced with . . . eyewitnesses who, with varying degrees of certainty and consistency, all identify his client as the perpetrator, should request a cautionary eyewitness instruction." 1999 UT 32, ¶ 28, 984 P.2d 376. Hunter also highlights that we found the performance of the trial counsel in *Maestas* to be deficient in part because "none of the identifications in [that] case were impervious to attack under the criteria set forth in *Long*," *id.* ¶ 29, and in part because the "counsel did nothing to focus the jury's attention on the limitations of eyewitness identification," *id.* ¶ 30. Hunter contends that, like in *Maestas*, his trial counsel's failure to request a *Long* instruction was deficient because the Surveillance Officers' testimonies were not "impervious to attack" under the *Long* factors.

¶72 *Maestas* is legally and factually distinguishable from the situation here. First, whether a witness's testimony was "impervious to attack" is not the proper test for determining whether counsel was constitutionally deficient under *Strickland*. The test is whether counsel's act or omission fell "below an objective standard of reasonableness." *Gallegos*, 2020 UT 19, ¶ 57. And the court in *Maestas* acknowledged as much, clarifying that it did "not wish to imply that in every case in which eyewitness identification is an issue, trial counsel's performance is per se deficient if a cautionary instruction is not requested." *Maestas*, 1999 UT 32, ¶ 32 n.2. We predicted that the "facts in another case might provide a plausible justification for such a tactic." *Id.* The court's conclusion flowed from the fact that the record did "not reveal any reasonable tactic that would ameliorate or explain" why counsel had not requested a *Long* instruction. *Id.* ¶ 32.

¶73 Second, *Maestas* presented a different factual situation than the one Hunter's counsel faced. The witness testimony in *Maestas* suffered from greater inconsistencies than those here. And the issues with eyewitness testimony that *Long* alerts the jury to were far more acute in *Maestas*. The robberies and identifications in *Maestas* occurred at night. *Maestas*, 1999 UT 32, ¶ 23. All of the witnesses in *Maestas* "had a limited opportunity to observe the robber" because "the robberies were completed quickly and the robber's face and head were covered." *Id.* ¶ 29. Further, the robber had pointed a gun at several of the witnesses, *id.* ¶¶ 2, 5, 9, 11, and many of the

witnesses were "afraid or fixat[ed] on the weapon rather than on the robber," *id.* ¶ 29. The descriptions the eyewitnesses gave "varied widely." *Id.* ¶ 24. Descriptions varied as to whether the robber had a limp or no limp, had brown eyes or green eyes, and spoke with an accent or no accent. *Id.* ¶ 24. Further, "at least some of the witnesses were making a cross-racial identification," *id.* ¶ 29, and "only three of the seven eyewitnesses could positively identify Maestas in a line-up when asked to choose among him and six other Hispanic males," *id.* ¶ 24.

¶74 The identifications in *Maestas* were also procedurally tainted because the police had employed a "highly suggestive show-up prior to the line-up in which they selected" the defendant. *Id.* ¶ 29. At that show-up, police had handcuffed Maestas, surrounded him with police cars with their lights shining on him at night, the officers told the eyewitnesses they had caught a suspect, and at least one of the witnesses "heard a report over the radio that the suspect was involved in another robbery, increasing the likelihood that he would believe Maestas also committed the robbery to which he was a witness." *Id.* ¶ 23.

¶75 Finally, Maestas's trial counsel "did nothing to focus the jury's attention on the limitations of eyewitness identification." *Id.* ¶ 30. Nor did he object to, attempt to correct, or ask questions on cross-examination about the "inaccurate testimony" of a detective who testified "without foundation that it is possible to identify a person when a witness sees the person, but to be unable to describe the person accurately." *Id.* ¶ 31.

¶76 *Maestas* is not this case. Unlike in *Maestas*, Hunter's trial counsel highlighted in his opening and closing arguments to the jury various weaknesses in the Surveillance Officers' testimony. *See supra* ¶¶ 25–29. Hunter's counsel noted that the Surveillance Officers had taken their eyes off of the Seller and that there was some distance between the Surveillance Officers and the drug transaction. *See supra* ¶ 26. He noted that the Surveillance Officers had used their personal binoculars and had not taken any photographs of the transaction. *Supra* ¶ 26. He further noted that the area was crowded and that the Surveillance Officers could not recall if there were other Black people in the area whom they could have confused with the Seller. *See supra* ¶ 26. Hunter's counsel also highlighted the inconsistencies between the Surveillance Officers' descriptions of the Seller and the takedown officers' descriptions of Hunter. *See supra* ¶ 27. And he emphasized other weaknesses in the State's evidence, including that the State hadn't tested the purity of the methamphetamine found on Hunter

to verify if it was the same as that found on the Buyer.[13] *See supra* ¶ 28.

¶77 A "reasonable, competent lawyer" could have looked at the factors that a *Long* instruction would have highlighted and determined that such an instruction would be unhelpful, or even hurtful, to his client's defense. *See Gallegos*, 2020 UT 19, ¶ 36 (citation omitted). That is, reasonable counsel could have concluded that focusing the jury's attention on frequently encountered problems with eyewitness testimony might have highlighted for the jury that the Surveillance Officers' identification did not suffer from many of those problems. Competent counsel could have reasonably concluded that using opening and closing arguments and cross-examinations to highlight specific weaknesses in the State's case was the safer route. And competent counsel could have considered that the "Credibility of Witnesses" instruction, which told the jury to assess factors such as "How good was the witness's opportunity to see, hear, or otherwise observe what the witness testified about" and whether the testimony was "consistent over time," *see supra* ¶ 31, gave him some of the *Long* instruction's upside with less of its potential downside.

¶78 Our conclusion comes into clearer focus when we compare the evidence before the jury to the factors the *Long* instruction details. First, there was nothing significantly impeding the "opportunity of the [Surveillance Officers] to view the [Seller] during the event." *See Long*, 721 P.2d at 493. Hunter asserts in his briefing to us that the lighting was "imperfect" and that the "sun's angle was casting long shadows that may have interfered with the [Surveillance Officers'] view." But that speculation is contrary to the record, which shows that area was "fairly well lit" and the weather was good at the time. *See supra* ¶ 5. Hunter's brief acknowledges that testimony but speculates about what the conditions "may have" been. Even if Hunter's speculations about the late-in-the-day "long shadows" were accurate, that still is nothing like *Maestas*, where the robberies occurred in the dark of night. *Maestas*, 1999 UT 32, ¶ 23. A reasonable, competent lawyer could have determined that further emphasizing the lighting and viewing conditions with a *Long* instruction might have hurt his defense.

---

[13] Hunter's counsel had extracted these details during cross-examination of the various officers and crime lab personnel. *See supra* ¶ 29.

¶79 Hunter also asserts that the Surveillance Officers had an "obstructed" view of the Seller during the transaction. Hunter asserts that the Buyer blocked McNamee's view of the Seller. But the evidence was less than definitive on that point. McNamee's testimony on his line of sight to the Seller's face was not clear.[14] Hunter also speculates that "Willis's view must also have been at least partially obstructed." But Willis testified that there were not "any obstructions" to his view, that the Seller was facing him,[15] and that he "could clearly see" the transaction.[16]

¶80 Hunter also characterizes the "length of time the officers had to observe the [Seller]" as "very short." The entire transaction took "less than 20 seconds," including the passing of the drugs, which took about ten seconds. *See supra* ¶ 10. During cross-examination, Hunter's trial counsel counted out a full ten seconds for the jury. Reasonable counsel could have concluded, after watching the jury's reaction to that demonstration, that ten to twenty seconds felt like a significant enough time that it would have been imprudent to further emphasize how long the Surveillance Officers had observed the suspect.

---

[14] On direct examination, McNamee said he saw the Buyer "approach the subject I described earlier," referring to the Seller, and that "subject's back was to me." In other words, McNamee indicated that the Seller's back was to him. But on cross-examination, McNamee agreed that "the back of the White male was to [him]" and "the front of the White male was to the Black male," implying that Seller was facing McNamee. In their briefing to us, however, both Hunter and the State agree that the back of the Buyer was to the Surveillance Officers, and the Seller faced the Surveillance Officers.

[15] Willis testified that the Seller was "facing to the south," and that the windows from which he and McNamee observed the transaction faced north and west, indicating that the Seller was facing them.

[16] Hunter also points out that Willis acknowledged that part of his interpretation of what he perceived was based on his "experience and training," rather than direct observation. But that statement by Willis was in response to the prosecution's question about whether he could "[a]ctually see the hand motions," *see supra* ¶ 9, and speaks more to the question of whether or not a drug transaction occurred, not whether Hunter was misidentified as the alleged seller.

¶81 As to the second *Long* factor, Hunter does not point to evidence before the jury that would show that the Surveillance Officers' "degree of attention to the [Seller] at the time of the event" was so compromised that the only reasonable strategy of a competent attorney would have been to highlight it with a *Long* instruction. *See Long*, 721 P.2d at 493. For example, Hunter asserts that "the area the officers were observing was full of distracting noises," but he points to nothing in the record that suggests the Surveillance Officers would have been distracted by noise. Hunter does accurately note that the area was crowded, but he again points to nothing in the record to show that the Surveillance Officers found the number of people to be a "distraction[]." To the contrary, the Surveillance Officers observed the event from the solitude of enclosed offices, and their sole purpose of sitting there was to watch the area to observe potential drug transactions. *See supra* ¶ 5. And Hunter's trial counsel pointed out multiple times in his opening and closing arguments that there were "multiple individuals present at that time milling about," including other Black people. A reasonable, competent attorney could have concluded that a *Long* instruction that further attuned the jury to the Officers' level of focus might have hurt Hunter's defense.

¶82 Hunter's better arguments about the Surveillance Officers' degree of attention and capacity to perceive and recall the pertinent details are, first, that men involved in the transaction were "stranger[s]" to the Officers. And second, that Willis provided a "detailed" description of the drug transaction but only a "general" description of the suspected Seller. Hunter notes that Willis gave a "general description of the man's clothing—camouflage pants, a black hoodie, black sunglasses, a black hat, and a gold necklace," but no description of his "facial features, height, age, hairstyle, facial hair (if any), or any distinguishing marks or characteristics." Hunter also highlights that neither the Surveillance Officers nor the takedown officers could recall how many other Black men or men of other races or ethnicities were in the area that day. *See supra* ¶ 18. Hunter additionally asserts that the Surveillance Officers "focused their attention on the white man until he walked out of sight." Hunter highlights how Willis stated he only "*may have* even kept view of both" the Buyer and the Seller, and how McNamee implied that he took eyes off of the Seller and then "transitioned back" and "returned to watching" the Black man he believed to be the Seller after the Buyer walked out of sight. (Emphasis added.)

¶83 We agree that the potential reliability of the Surveillance Officers' identifications may be undermined if the Seller was a "stranger" to them. *See Clopten I*, 2009 UT 84, ¶ 33 ("The research on eyewitness identifications . . . almost exclusively focuses on individuals who are attempting to identify a stranger."). We further agree that the reliability of the Surveillance Officers' identifications is somewhat undermined by the generality of their descriptions of the Seller, as well as their testimonies implying they were not exclusively focused on the Seller.

¶84 And that may be why during closing arguments, Hunter's counsel highlighted those facts. Hunter's counsel asked the jury to consider whether the Surveillance Officers' description of the suspected Seller was "so unique" as to make an accurate identification. And he highlighted how the description included nothing about height, age, weight, size, body type, or distinctive markings. *See supra* ¶ 27. Hunter's counsel also stressed that the Surveillance Officers didn't "stay focused" on the Seller and "took eyes off" him. Instead, they watched the Buyer before "turn[ing] back and . . . look[ing] at" the Seller. Although the Surveillance Officers' descriptions of the suspected Seller could have been more detailed, we are not convinced they were so lacking in detail or "attention" that it required Hunter's counsel to go beyond highlighting those deficiencies in his closing arguments. *Cf. Long*, 721 P.2d at 493. It is not difficult to conclude that reasonable counsel could decide to not request a *Long* instruction to emphasize this point, when the other *Long* factors were a mixed bag at best. Indeed, as we point out above and below, reasonable counsel could decide that much of what the jury would take from the *Long* instruction would encourage the jury to judge the Surveillance Officers' observations to be reliable.

¶85 Third, Hunter points to nothing in the record indicating that the Surveillance Officers lacked "capacity to observe the event" or lacked "physical and mental acuity." *See id.* Hunter highlights that the Surveillance Officers were stationed approximately a football field away from the transaction. But they both had binoculars through which they viewed the event, and they were able to describe details about the appearances of both the Buyer and Seller, their hand movements, and the substances they passed back and forth. *See supra* ¶¶ 5–9. Hunter's trial counsel pointed out multiple times in his opening and closing arguments that, although the Surveillance Officers viewed the transaction through binoculars, it was "at some distance." *Supra* ¶ 26. And he highlighted that the binoculars were

the Surveillance Officers' personal ones, not those issued by the police department. *Supra* ¶ 26. A reasonable, competent attorney could conclude that the *Long* instruction would actually focus the jury on the Surveillance Officers' otherwise unimpaired physical and mental capacity to observe, and that this would undermine the points he wanted to hammer home in his closing arguments.

¶86 As to the fourth *Long* factor—"whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion," *Long*, 721 P.2d at 493—there were some inconsistencies between how the Surveillance Officers described the attire and accessories of the suspected Seller and how the takedown officers described Hunter. But these discrepancies in Hunter's accessories were not the same level or type of inconsistencies that caused us to say in *Maestas* that counsel had rendered ineffective assistance by failing to request the *Long* instruction. *See Maestas*, 1999 UT 32, ¶ 24 (describing eyewitness inconsistencies regarding permanent characteristics of robber, including eye color and whether robber had a limp and accent). And unlike in *Maestas*, Hunter's trial counsel, in his closing argument to the jury, did highlight these discrepancies as to whether Hunter wore a gold chain and sunglasses, and whether the Seller had an orange sports drink. *See supra* ¶ 27. A reasonable, competent attorney could have concluded that a *Long* instruction could cut both ways and it was not worth the potential downside.

¶87 As to whether the identifications were "the product of suggestion," *see Long*, 721 P.2d at 493, Hunter argues that "McNamee's belief that the men had engaged in a drug deal must have been the product of suggestion because he, by his own admission, did not see any behavior that looked like a drug deal." But that's not what McNamee said. He testified that he saw a "White male approach the other subject, they briefly contacted each other, and then the White male began walking away." While McNamee's description does not alone definitively establish that a drug deal happened, it certainly is not an "admission" that he "did not see any behavior that looked like a drug deal." The jury also heard Willis provide detailed testimony about observing a drug transaction, *see supra* ¶¶ 8–9, which frustrates Hunter's argument about the import of any gaps in McNamee's testimony.

¶88 A reasonable, competent attorney could have concluded that the better avenue for undermining the State's identification of Hunter as the Seller was by highlighting the inconsistencies between the various witnesses' descriptions of the Seller and Hunter, and by

highlighting that the State did not test the purity of the drug samples to determine if the methamphetamine found on the buyer and on Hunter were the same—all of which Hunter's trial counsel indeed did in closing arguments and in cross-examinations. *See supra* ¶¶ 26–29.

¶89 Finally, we are also not convinced that evidence the fifth *Long* factor implicates—"the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly"—was such that reasonable counsel would have wanted a *Long* instruction. *See Long*, 721 P.2d at 493. This case is not like *Maestas*, where the robber had pointed a gun at several of the witnesses, *Maestas*, 1999 UT 32, ¶¶ 2, 5, 9, 11, and where many of the witnesses were "afraid or fixat[ed] on the weapon rather than on the robber." *Id.* ¶ 29. Nor is this case like *Long*, where the witness, "[a]t the same time he was identifying his assailant, . . . was shot, was thrown back against the wall by the force of the blast, returned the fire, and experienced 'glossy' vision," and failed to identify the defendant in a photo array. *Long*, 721 P.2d at 487–88. By contrast here, the Surveillance Officers had no weapons pointed at them, nor were there other similarly traumatizing distractions. Instead, the Surveillance Officers observed the event from the solitude of enclosed offices, and their sole purpose was to watch the area to observe potential drug transactions. *See supra* ¶ 81.

¶90 Under these circumstances—where the Surveillance Officers were not distracted by weapons or physical threats to their well-being—we cannot say it was unreasonable for counsel to choose not to attune a jury through a *Long* instruction about how eyewitness reliability is impacted by "the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly." *Long*, 721 P.2d at 493.[17]

---

[17] Another subfactor within the fifth *Long* factor is whether the race of the perpetrator was the same as the witness's. *Long*, 721 P.2d at 493; *see also Clopten I*, 2009 UT 84, ¶ 15 ("[P]eople identify members of their own race with greater accuracy than they do members of a different race."); *Maestas*, 1999 UT 32, ¶ 29 (noting that at least some of the identifications meriting a *Long* instruction in that case involved "cross-racial identification"). Hunter speculates that "there may have been a cross-racial identification" of Hunter by the Surveillance Officers. But Hunter acknowledges that the record does

(continued . . .)

¶91 Hunter argues that his trial counsel "could not reasonably rely on cross-examination without requesting a *Long* instruction" because the Surveillance Officers expressed "almost absolute certainty" in their identifications and because we said in *Clopten I* that where witnesses express that level of certainty, "the effectiveness of cross-examination is badly hampered." 2009 UT 84, ¶ 21. Hunter further highlights that in *Clopten I*, we said that that "[e]ven if cross-examination reveals flaws in the identification," a jury may nevertheless "have difficulty assessing the import" of those flaws and "in gauging the reliability of the identification," unless the jury has specific help in understanding the factors that may make eyewitness testimony more or less reliable. *Id.* ¶ 22.

¶92 But in *Clopten I* we were examining whether a trial court must admit expert eyewitness testimony regarding the reliability of eyewitness identification when timely requested. *Id.* ¶ 6. We were not analyzing whether it would be constitutionally deficient for a defense counsel not to request expert eyewitness testimony, let alone whether it would be constitutionally deficient for defense counsel not to request a cautionary instruction.

¶93 The question before us is simply whether Hunter's trial counsel's failure to request a *Long* instruction "caused [his] representation to fall below an objective standard of reasonableness," *Gallegos*, 2020 UT 19, ¶ 57, or "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial," *id.* ¶ 36 (citations omitted).

¶94 We conclude that a "reasonable, competent lawyer" could have chosen to not request a *Long* instruction. A reasonable, competent lawyer could look at the *Long* factors, compare them to the facts the jury heard, and reasonably determine that a *Long* instruction carried an unacceptable risk of increasing the jury's confidence in the Surveillance Officers' identification. And that competent attorney could conclude that highlighting inconsistencies

---

not include any evidence that would allow us to conclude that the identification of Seller was potentially tainted by the problems inherent in cross-racial identification. We are not at liberty to make guesses about facts that are not in the record, and therefore we cannot weigh this aspect of *Long* in our consideration of the performance of Hunter's trial counsel.

and weaknesses through cross-examination and opening and closing arguments was the less risky way to go.

¶95 We are not saying that was the best strategy or the right approach. But the question is "not whether some strategy other than the one that counsel employed looks superior given the actual results of trial." *Id.* ¶ 36 (citation omitted). Hunter's counsel "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107. There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 106 (citation omitted). Hunter has not met his burden to overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Gallegos*, 2020 UT 19, ¶ 34 (citation omitted); *see also id.* ¶ 37.

¶96 We therefore affirm the court of appeals' judgment that Hunter's trial counsel was not constitutionally deficient, though on a different ground than the one the court of appeals articulated.

## CONCLUSION

¶97 We hold that the court of appeals erred when it ruled that *Long* only applies to "memory-based" identifications. We nevertheless affirm Hunter's conviction because Hunter did not receive ineffective assistance of counsel. Hunter's trial counsel was not constitutionally deficient when he failed to request a *Long* instruction because a reasonable attorney could conclude that a *Long* instruction risked increasing the perceived reliability of the officers' testimonies and hurting Hunter's defense. Although we repudiate the reasoning the court of appeals employed to reach its decision, we affirm.