1999 UT 32

**STATE of Utah, Plaintiff and Appellee,**

v.

**Gino MAESTAS, Defendant and Appellant.**

No. 970298.

Supreme Court of Utah.

April 9, 1999.

Jan Graham, Att'y. Gen., Kenneth A. Bronston, Asst. Att'y. Gen., Roger S. Blaylock, Deputy District Att'y, Salt Lake City, for Appellee

Joan C. Watt, Salt Lake Legal Defender, for Appellant

DURHAM, Associate Chief Justice:

¶ 1   Gino Maestas appeals from convictions on eight counts of aggravated robbery. Maestas asserts that he was denied effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 7 of the Utah Constitution, because his trial counsel failed to (1) request a cautionary eyewitness identification instruction, (2) move to suppress the allegedly unreliable eyewitness identifications, (3) move to sever charges stemming from robberies at two different locations, (4) request a jury instruction limiting the use of double hearsay, and (5) move to consolidate two robbery counts based on the taking of property from one individual. Maestas argues that the above omissions entitle him to a new trial.

¶ 2   On February 2, 1995, a lone assailant robbed a Top Stop convenience store located at 488 East 100 South, and a Pizza Hut restaurant located at 787 North Redwood Road, within a period of one hour. According to the testimony at trial, a man entered the Top Stop just after 8:00 p.m., wearing a mask, a baseball cap, and a two-tone blue coat. The man walked to the counter, pulled out a gun, and demanded that the clerk, Paul Harbrecht, give him the money from the cash register. The robber also demanded that Harbrecht give up his wallet. Harbrecht complied, placing all the money from the cash register, approximately thirty-five dollars, and six dollars from his own wallet into a small off-white backpack that the robber placed on the counter. The robber allowed Harbrecht to keep his wallet and his identification. The robbery lasted approximately two minutes.

¶ 3 Harbrecht testified at trial that he pushed the store's "panic button" to alert police to the robbery, then ran outside to watch the robber flee. The robber jogged down the street for approximately half a block, then got into a gold-colored mid–80's Camaro. Harbrecht stated that he was not afraid during the robbery because he had been robbed only four months earlier. He concentrated on the robber's exposed features—his eyes, eyebrows, and nose. Officer Rose Marie Jones responded to the robbery call. Harbrecht described the robber as a Hispanic male in his twenties, between 5'7" and 5'9" inches tall, with short dark hair and dark eyes. He stated that the robber was wearing a white hat, blue Levis, and a two-tone blue coat. Although the lighting outside was poor, Harbrecht opined that the robber escaped in a gold-colored Camaro.

¶ 4 While Officer Jones was filling out the robbery report, she and Harbrecht heard another robbery being reported over her police radio involving a perpetrator with a description similar to the Top Stop robber. Officer Jones responded to that call. As she left, she told Harbrecht that she might return to pick him up so he could identify the suspect. Later, Officer Jones did just that, stating, "they had caught a suspect and [she] wanted [Harbrecht] to identify him." She drove Harbrecht to where other officers had stopped Maestas. Maestas was surrounded by police officers, wearing handcuffs, and standing with a spotlight and headlights directed towards him. Harbrecht identified Maestas as the individual who had robbed the Top Stop a short time earlier.

¶ 5 The second robbery (which accounts for seven of the eight counts of aggravated robbery) occurred at a Pizza Hut restaurant on Redwood Road at approximately 8:55 p.m. The robber wore Levis, a bluish-green and gray jacket, brown hiking boots and a hat; a dark mask covered his head and the lower part of his face. The robber entered the restaurant and pulled out a gun. The robber approached Pizza Hut employee Kurt Anderson, pushed the gun against Anderson's chest, and demanded that he place the money from the cash register into a bag. Anderson was scared, and his "life

flashed before [his] eyes." Anderson gave the bag to the Pizza Hut manager Jesse Baldwin and told him they were being robbed. The robber then ordered Anderson to the floor. From the floor, Anderson could no longer observe the robber or his interactions with the restaurant patrons. He did, however, hear the robber demand, in a Spanish accent, the money from the cash register and the safe, and from the other restaurant patrons. Anderson later described the robber as wearing a bluish-green and gray jacket and hiking boots and walking with a "limp."

¶ 6 With Anderson on the floor, Baldwin complied with the robber's request, placing approximately $170 from the cash register, including $10 in loose change, into the bag. During the delay, while the safe's timing cycle was operating, the robber collected money from the store employees and two restaurant customers. Anderson gave the robber six dollars from his wallet and Baldwin gave him between $15 and $20. The robber allowed both Anderson and Baldwin to keep their wallets.

¶ 7 Baldwin observed the robber for a total of approximately four minutes, sometimes from as far away as forty feet. Baldwin described the robber as in his twenties, weighing 180 pounds, with dark brown eyes, thick eyebrows, and a wrinkled forehead. He stated that the robber spoke with an accent, walked with a distinctive gait, and had an "odd" posture. According to Baldwin, the robber wore a black mask which extended all around his head, a white baseball cap, a "green, greenish-gray, greenish blue" coat, and navy-blue or black pants.

¶ 8 Shortly after the robbery, Officer Richard Findlay took Anderson and Baldwin to view a possible suspect located about a block from the restaurant. Maestas was handcuffed and standing in a spotlight between several patrol cars with their emergency lights activated. Anderson and Baldwin discussed the similarities and differences between Maestas and the robber. Baldwin thought the eyes were the same as the robber's. Anderson thought Maestas wore the same shoes. Both Anderson and Baldwin identified the jacket taken from Maestas' car

as the one worn by the robber. Although initially unsure, after viewing the jacket, both identified Maestas as the robber.

¶ 9 Candace Hsiao and her daughter Kara were customers in the Pizza Hut during the robbery. They testified that while they were eating and talking, a Hispanic male wearing a black muffler over his head and face approached, pointed a gun at them, and asked for their purses. Candace and Kara were terrified. Candace "blocked out" everything except the gun. Candace gave the robber $15 in cash and bills and the money pouch in her day planner. Kara gave him five crumpled dollar bills.

¶ 10 Kara described the robber as wearing a white sweatshirt and hiking boots. According to Kara, the robber was polite and spoke with a slight accent. Later, at the show-up, neither Candace nor Kara could positively identify Maestas as the robber.[1]

¶ 11 Pizza Hut employees Shelby and Leslie Kurys were cleaning their work stations when Shelby saw the robber with a gun pointed at Anderson's back. The robber ordered Shelby and Leslie to the ground and asked for their wallets and wedding rings. The couple refused to give up their rings and did not have wallets. They did not see much because they remained on the floor until the robber left. However, they noted that the robber had a black mask, thick eyebrows and brown or hazel eyes. Both Shelby and Leslie described the robber as having a distinctive gait.

¶ 12 At the line-up, after viewing Maestas at the show-up, Harbrecht, Anderson, and Baldwin all identified Maestas as the robber. Candace and Kara Hsiao did not choose Maestas from the line-up, although they did identify him as a possibility. Leslie and Shelby Kurys both chose individuals other than Maestas from the lineup.

¶ 13 At trial, Harbrecht, Baldwin, and Anderson, all of whom had viewed Maestas at the show-up, identified Maestas as the robber. Kara and Candace Hsiao, who also

had seen Maestas at the show-up but could not pick him out of a line-up, testified that they thought, but were not sure, that Maestas was the person who robbed them. Leslie and Shelby Kurys, after choosing different individuals from the line-up, identified Maestas as the robber at trial. There were similar inconsistencies at trial in the testimony identifying the coat recovered by police from Maestas' car as that worn by the robber. Some witnesses recognized it, others did not.

¶ 14 At trial, in addition to the eyewitness accounts described above, the following evidence was offered: Officer Donald Cole testified that shortly after the Pizza Hut robbery he received a description of the suspect: "male Hispanic, dark hair, dark eyes, wearing a ... blue and green jacket." An updated description included the fact that the suspect might be driving a blue late 70's Camaro. [id] Approximately 3 ½ blocks from the Pizza Hut, Officer Cole observed a blue Camaro parked in an apartment driveway. The hood felt warm, indicating that the car had recently been driven. From outside the car, Officer Cole observed crumpled dollar bills on the passenger seat and a blue and green jacket in the backseat.

¶ 15 Officer Cole then saw two people exit the apartment and get into the Camaro and drive off. Officer Cole stopped the car a few blocks away. Between five and seven other officers assisted him in the stop. Maestas was driving the Camaro; Mary Sisneros was the passenger. About $53 was recovered from the Camaro and officers found a blue and green jacket in the back seat. According to Officer Cole at trial, "all" the robbery victims positively identified Maestas as the robber and "all" recognized the jacket as the one worn by the robber.

¶ 16 Officer Cole transported Maestas to the police department, while other officers conducted a search of Sisneros' apartment. The search located a dark neck gator, a head band, and a hat. No money or clothing matching the robber's was found.

---

1. The record is unclear regarding whether Candace or Leslie and Shelby Kurys were at the show-up. Officer Cole testified at trial that he had Officer Findlay transport the Pizza Hut victims to the show-up. Officer Cole further testified that all the Pizza Hut victims positively identified Maestas as the robber at the show-up. Thus, although not specifically mentioned in the record, a reasonable inference is that all the victims participated in the show-up.

¶ 17 Maestas testified in his own defense that on the evening of the robberies, he went to a family party at Sisneros' residence. He claimed he arrived at the apartment at approximately 5:30 p.m. and remained there until about 9:00 p.m. During that time, Maestas testified, he helped Sisneros clean up from dinner and watched some television. He claimed he did not leave the apartment at all during the evening until the time of his arrest. Maestas also pointed out that, in contrast to the descriptions offered by the eyewitnesses: (1) at the time of the robbery, he weighed only 135–40 pounds, not 180; (2) he had green, not brown, eyes; (3) he did not speak with an accent; and (4) he did not walk with a limp or a distinctive gait. Furthermore, Maestas testified that he was wearing sweat pants and a hooded sweatshirt at the time of his arrest, not the clothing described by the robbery victims, and that he had not changed his clothes that evening.

¶ 18 Sisneros corroborated Maestas' testimony, confirming that he was at her home from approximately 5:30 p.m. until 9:00 p.m., that he helped her clean up after dinner, watched television, drank some beer, and that he did not leave during that interval.

¶ 19 On rebuttal, Detective Dalling testified that Sisneros told him that she had spent a considerable amount of time that evening cleaning other parts of the apartment and, therefore, she would not necessarily have known if Maestas had left the apartment. Detective Dalling also testified that, during the search, he found food throughout the kitchen, giving it the appearance that it had not been cleaned. Sisneros claimed at the trial that she did not remember telling the above to Dalling.

## I. STANDARD OF REVIEW

¶ 20 Because new counsel represents Maestas in this appeal and because we believe the record is adequate to review his claims of ineffective assistance of counsel on direct appeal, we will review those claims as a matter of law. *See State v. Chacon*, 962 P.2d 48, 50 (Utah 1998). To establish that he received ineffective assistance of counsel, Maestas must show that his counsel "rendered deficient performance which fell below an objective standard of reasonable professional judgment" and that "counsel's deficient performance prejudiced him." *Id.* To do this, Maestas must "identify specific acts or omissions that fell outside the wide range of professional assistance and illustrate that, absent those acts or omissions, there is a 'reasonable probability' of a more favorable result." *Id.* (quoting *Parsons v. Barnes*, 871 P.2d 516, 522 (Utah 1994)). To determine whether there is a reasonable probability of a more favorable outcome, we consider "the totality of the evidence taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *State v. Hovater*, 914 P.2d 37, 39–40 (Utah 1996). Finally, in reviewing counsel's performance, we give trial counsel wide latitude in making tactical decisions and not question those tactical decisions unless there is no reasonable basis supporting them. *See Taylor v. Warden*, 905 P.2d 277, 282 (Utah 1995).

¶ 21 Maestas asserts that he received ineffective assistance of counsel because his trial counsel failed to seek suppression of the blatantly suggestive eyewitness identifications and because counsel failed to request a cautionary eyewitness instruction at trial, which would have informed the jury of the weaknesses inherent in such identifications. Maestas argues that the case against him turned on the eyewitness identification; thus, had the jury received an appropriate instruction, it is probable that they would have returned a more favorable verdict. Alternatively, Maestas suggests that had trial counsel moved to suppress the eyewitness identifications made by the robbery victims at the show-up, the trial court would have granted that request with respect to at least some of the eyewitnesses, thus reducing the number of eyewitnesses identifying him at trial and significantly diluting the strength of the State's case against him.

## II. FAILURE TO REQUEST CAUTIONARY EYEWITNESS INSTRUCTION

¶ 22 Maestas asserts that trial counsel performed deficiently by failing to request a

cautionary instruction regarding the eyewitness testimony.

¶ 23 The original identification in this case occurred at night with Maestas handcuffed and surrounded by police cars with their lights shining on him. The officers told the eyewitnesses that they had caught a suspect. Additionally, Harbrecht heard a report over the radio that the suspect was involved in another robbery, increasing the likelihood that he would believe Maestas also committed the robbery to which he was a witness. Furthermore, the suggestive nature of the show-up in this case is compounded by the fact that none of the witnesses ever saw the full face of the robber. All the witnesses testified that in both the Top Stop and Pizza Hut robberies the robber wore a mask covering his nose and mouth, and a cap covering his head.

¶ 24 There are additional factors that call into question the plausibility of the individual eyewitness identifications in this case. Most of the witnesses had limited opportunity to observe the robber. Many were frightened. Baldwin and Anderson discussed Maestas' similarities to and differences from the robber at the show-up, suggesting that either Baldwin's or Anderson's degree of certainty that Maestas was the robber was bolstered by comments made by the other. The descriptions given by the eyewitnesses also varied widely. The robber was described by different witnesses as having wrinkles, weighing 180 pounds, having a limp, having no limp, speaking with an accent or no accent, having brown eyes or green. The witnesses also disagreed about the clothing the robber wore. Some claimed the jacket found by police in Maestas' car was the one worn by the robber; others were unable to identify it. Some could identify the hat confiscated from Sisneros' apartment; others could not. Finally, and perhaps most persuasively, only three of the seven eyewitnesses could positively identify Maestas in a line-up when asked to choose among him and six other Hispanic males.

¶ 25 The only defense available to Maestas at trial was the unreliability of the eyewitness identifications. Our cases have summarized the empirical studies questioning the reliability of eyewitness identification. See State v. Ramirez, 817 P.2d 774, 779–80 (Utah 1991); State v. Long, 721 P.2d 483, 488–92 (Utah 1986). "The studies all lead inexorably to the conclusion that human perception is inexact and that human memory is both limited and fallible." Long, 721 P.2d at 488.

¶ 26 In Long we concluded that, if requested, a trial court must give a cautionary eyewitness identification instruction in every case where identification is a central issue. See id. at 492. Our conclusion was based on research showing that juries have a fundamental misunderstanding of the reliability of eyewitness identifications. We noted that because jurors do not appreciate the fallibility of such identifications, they often give eyewitness testimony undue weight. See id. at 490.

¶ 27 Although research has convincingly demonstrated the weaknesses inherent in eyewitness identification, jurors are, for the most part, unaware of these problems. People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory process · of an honest eyewitness. Moreover, the common knowledge that people do possess often runs contrary to documented research findings. See id. at 490.

¶ 28 Our decision in Long leads to the conclusion that, unless obvious tactical reasons exist to forego an instruction, trial counsel faced with seven eyewitnesses who, with varying degrees of certainty and consistency, all identify his client as the perpetrator, should request a cautionary eyewitness instruction. Such an instruction would, as pointed out in Long, apprise the jury of the inherent limitations in eyewitness identification. See Long, 721 P.2d at 492.

¶ 29 The State asserts that competent counsel may have reasonably refrained from requesting a cautionary instruction because the instruction would "bolster" the stronger eyewitness identifications, making the jury more likely to convict Maestas. See id. at 492 n. 5. The State's argument is unpersuasive. First, none of the identifications in this case were impervious to attack under the criteria set forth in Long. All of the wit-

nesses had a limited opportunity to observe the robber; the robberies were completed quickly and the robber's face and head were covered. Additionally, at least some of the witnesses were making a cross-racial identification. Some of the witnesses testified to being very afraid or fixating on the weapon rather than on the robber. Furthermore, as set forth above, most, if not all, the witnesses' identifications were tainted by a highly suggestive show-up prior to the line-up in which they selected him.

¶ 30 Trial counsel did nothing to focus the jury's attention on the limitations of eyewitness identification. He did not educate the jury with respect to the factors set forth in *Long,* which affect eyewitness identification, nor did he argue how each of those factors could have affected particular eyewitnesses. Counsel did not present expert testimony regarding the unreliability of eyewitness identification. In sum, the record is devoid of evidence or argument that would adequately inform the jury regarding the problems inherent in eyewitness identifications.

¶ 31 Furthermore, in addition to failing to request a cautionary instruction, defense counsel did not object to Detective Dallings' inaccurate testimony regarding eyewitness identification. Detective Dalling explained the discrepancies in the eyewitnesses' descriptions of the robber by testifying without foundation that it is possible to identify a person when a witness sees the person, but to be unable to describe the person accurately. Defense counsel did not cross examine Detective Dalling regarding this statement, or in any way attempt to correct the impression of the reliable nature of eyewitness identification that the detective's testimony presented.

¶ 32 In sum, under the facts of this case, trial counsel rendered objectively deficient performance by failing to request a cautionary eyewitness identification instruction that would have informed the jury of the unreliability of eyewitness identifications.[2] The rec-

ord does not reveal any reasonable tactic that would ameliorate or explain that deficiency.

### III.  PREJUDICE

¶ 33 The State asserts that even if we find that Maestas' trial counsel rendered objectively deficient performance in failing to request a cautionary eyewitness instruction, Maestas was not prejudiced by that failure. The State claims that any error was harmless because there was an "abundance" of evidence supporting Maestas' conviction.

¶ 34 We conclude, however, that the absence of a cautionary instruction seriously undermined the fairness of this trial. *See State v. Young,* 853 P.2d 327, 367 (Utah 1993). Counsel's omission went to the heart of the defense—the theory that Maestas was mistakenly identified as the robber. An appropriate jury instruction would have highlighted the weaknesses in the remaining identifications for the jury, which might well have changed the verdict.

¶ 35 We do not find the other evidence supporting the conviction conclusive. Harbrecht observed the robber getting into a Camaro—the same make of automobile driven by Maestas at the time of his arrest. Hot air and a warm hood indicated that the Camaro had recently been driven, contrary to Maestas' testimony that he remained at Sisneros' apartment all evening. Officer Cole recovered "several" crumpled dollar bills from the front seat of Maestas' Camaro—the robber took (exactly) five crumpled dollar bills from Kara Hsiao during the Pizza Hut robbery. Some of the witnesses identified the coat found in Maestas' car as the one worn by the robber. A search of Sisneros' apartment revealed a dark neck gator capable of being used as a mask and a hat that some of the eyewitnesses claimed the robber wore.

¶ 36 The foregoing circumstantial evidence is inconclusive when viewed in light of what the officers did *not* find. Each eyewitness testified that the robber used a gun. No gun was found. The Pizza Hut employees indicated that the robber stole at least

---

2.  We do not wish to imply that in every case in which eyewitness identification is an issue, trial counsel's performance is per se deficient if a cautionary instruction is not requested. The

facts in another case might provide a plausible justification for such a tactic. The record in this case, however, does not.

$15 in loose change. No change was found on Maestas or Sisneros, in his car, or in Sisneros' apartment. Only $53 was recovered from Sisneros and/or from Maestas' car, whereas over $200 was taken in the robberies. No money was found in the apartment. The officers also did not find the bags used in the robberies or the day planner pouch stolen from Candace Hsiao. Maestas was not wearing clothing consistent with the descriptions of the robber at the time of his arrest, nor did the searches of Maestas' car and Sisneros' apartment locate such clothing. Maestas' car, although the same make as the one used in the Top Stop robbery, was a lowrider with chrome wheels; it did not match the description of the car seen leaving the Top Stop as to year and color. On balance, we find that the circumstantial evidence against Maestas is not overwhelming or conclusive. Thus, absent defense counsel's deficient performance, there is a reasonable likelihood that a more favorable result would have been reached.

¶ 37 We hold that trial counsel's failure to request a cautionary eyewitness instruction rendered his performance constitutionally deficient and prejudiced Maestas. Maestas is entitled to a new trial. Reversed and remanded.

Chief Justice HOWE, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Associate Chief Justice DURHAM's opinion.

