2026 UT App 35

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL ANTHONY HORN,
Appellant.

Opinion
No. 20230970-CA
Filed March 12, 2026

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 221100099

Lyla Mahmoud, Wendy Brown, Debra M. Nelson,
and Benjamin Miller, Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1 A Utah Highway Patrol trooper (Trooper 1) attempted to pull over a car matching the description of a vehicle reported to have been driving dangerously, but the car sped away. Michael Anthony Horn was subsequently identified as the car's driver, arrested, and charged with failure to respond to an officer's signal to stop. At trial, Trooper 1 testified that he had clearly seen Horn driving the car, and a jury convicted Horn of the charge.

¶2 Horn now appeals, arguing that Trooper 1's identification testimony was inherently improbable because the morning in question was rainy and overcast, the incident occurred just after dawn while motorists still had their headlights on, and the car

passed Trooper 1 at a high speed. Anticipating that his inherent improbability claim may not have been preserved for appeal, Horn argues alternatively that the trial court plainly erred by not sua sponte determining that Trooper 1's identification testimony was inherently improbable and, on that basis, granting Horn's directed verdict motion. We conclude that Horn's inherent improbability claim was not preserved. We also conclude that because Trooper 1's identification testimony was not internally inconsistent and was corroborated by other evidence that Horn was the driver, the court did not plainly err by denying Horn's directed verdict motion.

¶3     Horn also asserts that his trial counsel (Counsel) provided ineffective assistance by failing to argue that this was a process-of-elimination case and by failing to move to exclude Trooper 1's identification testimony—or at least to request a cautionary jury instruction related to it—under rule 617 of the Utah Rules of Evidence. We conclude that this was not a process-of-elimination case and that Counsel acted reasonably in not presenting it as one. Additionally, because the factors enumerated in rule 617 do not indicate that Trooper 1's testimony was unreliable, we determine that Counsel did not perform deficiently by not requesting exclusion or by, instead, choosing to highlight weaknesses in Trooper 1's testimony through cross-examination and closing argument.

¶4     Because we reject each of Horn's arguments, we affirm his conviction.

BACKGROUND[1]

*Trooper 1 Initially Observes Horn*

¶5 On the morning of March 31, 2022, Trooper 1 was on patrol in Box Elder County. Around 7:20 a.m., he heard dispatch broadcast an "attempt to locate" a "silver sports car" with Texas license plates that was reported to be "not maintaining its lane" and "going . . . towards oncoming traffic." Trooper 1 drove toward where the vehicle had been reported, and he spotted— between one hundred and two hundred yards away—a silver sports car with Texas plates driving toward him. After spotting the car, Trooper 1 shifted his "focus and concentration" to "who was operating the vehicle." As Trooper 1 and the car passed each other, Trooper 1 "g[ot] a clear look at who was driving the vehicle." The day was rainy and there was "cloud cover," but Trooper 1 saw the driver—including the driver's facial hair— clearly enough that he felt he could say, "[I]f I see him again, I'll know who it is."

¶6 Trooper 1 "flipped around" and caught up to the car. He was able to read the license plate number and see that the car's registration tags were expired. He called in the plate number, and he also ran the plate number on his computer. The car was registered to M. Horn and T. Swickard and was not reported as stolen. Trooper 1 confirmed with dispatch that the person who made the initial report was willing to testify to having witnessed "bad driving behavior." At that point, Trooper 1 activated his overhead lights to initiate a stop, which also started Trooper 1's dashcam recording. The time marker on the dashcam footage

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Alvarado*, 2023 UT App 123, n.2, 538 P.3d 633 (cleaned up).

indicates that the recording began at 7:24 a.m.[2] Trooper 1 saw the car's brake lights come on as if it was going to stop, but then the car accelerated and sped through a four-way intersection. The intersection and roads were somewhat busy, and Trooper 1 did not want to "put the public at risk." So given his confidence that he "could identify the driver and the vehicle," Trooper 1 stopped pursuing the car. Instead, Trooper 1 alerted troopers south of him that the car was headed in their direction.

*Other Officers See the Car and Eventually Stop It*

¶7    Soon after, one of these troopers (Trooper 2) saw the car heading southbound. The car came up behind Trooper 2 and "slowed down to about fifty-five miles an hour, and then [it] passed [Trooper 2] and sped up to about ninety." "As it passed [Trooper 2], the driver appeared to look away," so Trooper 2 could not see the driver's facial features. Trooper 2 followed the car as it crossed into Weber County and exited the freeway, but the car "sped off" after entering a school zone, and Trooper 2 discontinued his pursuit and radioed law enforcement in Weber County about the car. Trooper 2 noted that he spoke to a Weber County deputy sheriff (Deputy) about the car at 8:13 a.m.

¶8    Meanwhile, Trooper 1 received a call from Deputy, who said he was familiar with the car and that M. Horn was Michael Horn and T. Swickard was Tiffany Swickard. Trooper 1 searched Facebook for a Michael Horn from Texas and saw that the pictures

---

2. Trooper 1 testified at trial that his dashcam uses a continual loop system such that activating his overhead lights captures video beginning about thirty seconds prior to the activation. The dashcam footage thus did not capture Trooper 1's initial view of the car, but it captured him following the car before activating his overhead lights.

of Horn "on Facebook were the same as the person that [Trooper 1] saw operating that vehicle on that morning."

¶9    In the early afternoon, Deputy found the car parked at a gas station in Weber County. Deputy called in other officers, and as the car moved to the gas pump area, the officers "conducted a high-risk or a felony stop" of the car. The driver who exited the car was Swickard; Horn was not in the car. Swickard informed the officers that Horn was in a nearby grocery store, and the officers found him, took him into custody, and brought him back to the gas station.

*Trooper 1 Speaks with Swickard and Horn*

¶10    Trooper 1 arrived on scene, and his bodycam captured footage of a brief conversation he had with Swickard before speaking to Horn. After advising Swickard that she was not under arrest and was free to leave, Trooper 1 asked her, "Where were you this morning?" Swickard responded, "Asleep in the passenger seat." She said she and Horn had been sleeping at a truck stop nearby and she "didn't even know [they] left from there." She continued, "I'm apparently a harder sleeper than I thought I was 'cause I didn't know we left the [truck stop]." She said that she did not remember anything from that morning.

¶11    After this, Deputy turned Horn over to Trooper 1's custody. Trooper 1's bodycam captured footage of his conversation with Horn while driving Horn to jail. Trooper 1 referred to Horn fleeing from him in Box Elder County earlier that morning, and Horn said that was "impossible" because Horn did not know that area and there was "no way [he] was all the way up [t]here." Horn insisted he was at a truck stop that morning—the one mentioned by Swickard—and that Trooper 1 must be mistaking his car for someone else's. Trooper 1 told Horn he had identified the license plate of Horn and Swickard's car, but Horn was adamant that he "wasn't in Box Elder [that] morning." Horn

claimed that he had been "asleep in [his] car . . . [w]ith [his] dogs and [his] wife" at the truck stop and that he left the truck stop around 8:00 a.m. Trooper 1 asked, "Was your car with you the whole time?" Horn responded, "Yes, sir." Trooper 1 asked, "[Y]ou didn't . . . let anybody drive your car this morning, did you?" Horn responded, "No, sir."

*Horn is Charged and the Case Goes to Trial*

¶12 The State charged Horn with failure to respond to an officer's signal to stop.[3] The case proceeded to a two-day jury trial. The State called Trooper 1, Trooper 2, and Deputy as witnesses, and they testified in accordance with the account given above.

¶13 Trooper 1 also testified that he had received training in identifying the operator of a vehicle. In addition, he said, "In the past, I've had people try to switch drivers on me, . . . [and] [b]ased on the [attempt to locate], I was concerned that it was possibly a DUI, and knowing past history of people switching drivers, I wanted to be sure of who was driving, so I paid close attention to the driver of the vehicle." Trooper 1 testified that he was "a hundred percent sure" that Horn was the driver he saw.

¶14 Trooper 1 also stated that the speed limit in the area where he saw, passed, and then followed Horn was fifty-five miles per hour and that Trooper 1 was driving between forty-five and fifty-five miles per hour when he passed Horn. During cross-examination, Trooper 1 acknowledged that because Horn was driving in the opposite direction, it was equivalent to seeing someone go by at about one hundred miles per hour. Counsel played some of Trooper 1's dashcam footage and asked Trooper 1 whether he was able to identify any of the drivers of the cars

---

3. The State also charged Horn with owning and operating a motor vehicle without insurance but dropped this charge at the beginning of Horn's trial.

shown in the footage. Trooper 1 replied, "My camera resolution's not good enough for me to see. . . . If I was in my patrol car, I could identify them." Trooper 1 acknowledged that the dashcam showed that cars had their headlights on at the time. On redirect, the prosecutor asked Trooper 1 whether he was able to read Horn and Swickard's car's license plate from the dashcam footage, and Trooper 1 responded, "I can't read it with this resolution and the camera limitations." He also could not see from the dashcam video that the plate was from Texas. The prosecutor asked how he knew the correct license plate number on the day of these events, and Trooper 1 responded, "[M]y eyes are much better than this camera resolution." And he agreed that his ability to identify the driver was also "very much better" than the dashcam footage showed.

¶15     Deputy, too, testified that what he could see with his eyes was "considerably better" than what he could see in the dashcam video from his patrol vehicle that day. And he said that while Horn's license plate in his dashcam footage was "fuzzy," he was able to see it clearly in person.

¶16     Trooper 1 was later recalled to the witness stand. Trooper 1 testified that when he saw Horn driving the car, he "clearly saw facial hair." He said that when he later saw Horn in Deputy's custody, he recognized Horn's facial hair—as well as his facial features—from earlier. Also, on recross-examination, Counsel asked Trooper 1 whether he saw anyone else in the car that morning. Trooper 1 responded that he "was looking for the driver specifically" and "wasn't looking beyond that." He also noted that when the car was stopped that afternoon at the gas station, "the passenger seat was laid back all the way, so even if there was someone, [he] probably wouldn't have seen them." He continued, "[Swickard] told me . . . that she was sleeping all morning, so I'd assume if she was sleeping, it was laid back."

¶17    After the State rested, Counsel moved for a directed verdict. Counsel's argument, in its entirety, was as follows: "We don't believe that the State has presented evidence sufficient for a reasonable jury to convict Mr. Horn beyond a reasonable doubt." The trial court responded, "Given the evidence that's been presented at this time, I'm going to deny your motion. There has been sufficient evidence that a reasonable jury could determine and find [Horn] guilty [of] . . . failing to stop at the command of a police officer. So I'll deny that, [Counsel]."

¶18    Swickard testified in Horn's defense. She said that she and Horn arrived at the truck stop around 1:40 a.m., that she woke up at the truck stop between 10:30 and 11:00 a.m., and that Horn was already awake. She said that she was in the passenger seat and Horn was in the driver seat. On cross-examination, she reiterated that she was never in the driver seat that morning and agreed that there was "zero reason for anybody else but [Horn] to be in the driver[] seat."

¶19    In closing argument, Counsel highlighted purported problems with Trooper 1's identification of Horn. Counsel emphasized that at 7:20 a.m. the sun had risen only moments before, that "it was raining and overcast," that "the headlights from oncoming traffic were [on]" so Trooper 1 "wasn't able to see anything through someone else's windshield because there would've been headlights hitting him right in the . . . eye," that the drivers' speeds were "the equivalent of someone flying past you on the road at over a hundred miles an hour," and that Trooper 1 "had no idea if there was anyone else in the vehicle" because "[h]e wasn't paying enough attention." Counsel also discussed the malleability of memory and implied that Trooper 1's identification testimony was unreliable.

¶20    The jury found Horn guilty, and he now appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 Horn argues that Trooper 1's testimony—particularly that he clearly saw Horn as the driver when Horn and Trooper 1 drove past each other—is inherently improbable and that without this testimony the State's evidence was insufficient to support the jury's verdict. He contends that this argument was preserved and that if it was not, the trial court plainly erred by not sua sponte ruling that Trooper 1's identification testimony was inherently improbable and, on that basis, granting his motion for a directed verdict. We conclude that Horn's inherent improbability argument is not preserved, and we therefore address it through the lens of plain error. Because a plain error claim involves no lower court ruling, we decide such claims in the first instance as a matter of law. *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).

¶22 Horn also asserts that Counsel provided ineffective assistance by (1) failing to argue that this was a process-of-elimination case and (2) failing to move to exclude Trooper 1's identification testimony—or at least request a cautionary jury instruction related to it—under rule 617 of the Utah Rules of Evidence. Because an ineffective assistance of counsel claim raised for the first time on appeal involves no lower court ruling, we decide it in the first instance as a matter of law. *Id.*

ANALYSIS

I. Inherent Improbability

¶23 Horn first asks us to "reject [Trooper 1's] testimony claiming to have been able to identify [Horn] because that testimony was physically impossible or incredibly dubious, both of which render [Trooper 1's] testimony as to identity inherently improbable." The State contends that this argument was

unpreserved. Horn responds that either this claim was preserved or the trial court plainly erred by not sua sponte rejecting Trooper 1's identification testimony as inherently improbable. We first assess preservation and determine that this claim was not preserved. We then consider plain error and conclude that the court did not plainly err by not sua sponte rejecting Trooper 1's identification testimony as inherently improbable. Accordingly, we determine that the court did not err in denying Horn's directed verdict motion.

A.     Preservation

¶24     Horn argues that "any motion targeted at the general sufficiency of the evidence also encompasses the inherent improbability of that evidence for preservation purposes." He acknowledges caselaw from our court holding that a party must specifically preserve the issue of inherent improbability and that a general insufficiency-of-the-evidence argument does not accomplish this. *See, e.g.*, *State v. Lewis*, 2020 UT App 132, ¶ 45 n.5, 475 P.3d 956 ("Because [the defendant's] directed verdict motion was general, asserting only that the State failed 'to make a prima facie case on all three counts,' he did not preserve any specific inherent improbability claim."). But he asserts that "[t]he inherent-improbability doctrine was never meant to have a preservation requirement narrower than the general directed verdict motion." He bases this argument on his reading of *State v. Stricklan*, 2020 UT 65, 477 P.3d 1251.

¶25     In *Stricklan*, a stepdaughter claimed that her stepfather had touched her inappropriately, but she later recanted. *Id.* ¶¶ 1, 6, 13. At trial, the stepfather moved for a directed verdict after the State rested. *Id.* ¶ 24. The stepfather "relied on cases holding that a single, out-of-court and uncorroborated statement cannot sustain a conviction as a matter of law." *Id.* After this motion was denied and the jury convicted the stepfather, he moved to arrest judgment, "again argu[ing] the State had not presented evidence

to corroborate [the stepdaughter's] recanted, out-of-court statement." *Id.* ¶ 26. On appeal, the stepfather also "argue[d] that [the stepdaughter's] testimony was inherently improbable," pointing to our supreme court's decision in *State v. Robbins*, 2009 UT 23, 210 P.3d 288, "in which [the court] tossed out a conviction because the victim's testimony was inherently improbable." *Stricklan*, 2020 UT 65, ¶ 124. The State asserted that this argument was unpreserved. *Id.* ¶ 125. In response, our supreme court reasoned,

> An issue is preserved if it was presented before the district court in such a way that the court has an opportunity to rule on it. To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority.

> Here the district court did not have an opportunity to rule on the *Robbins* issue. Indeed, the district court never would have known that [the stepfather] wanted it to assess the inherent improbability of [the stepdaughter's] testimony. None of the arguments below articulated a *Robbins* argument nor suggested that [the stepdaughter's] testimony was inherently improbable.

*Id.* ¶¶ 127–28 (cleaned up). The court acknowledged that the stepfather's motion to arrest judgment referenced *State v. Workman*, 852 P.2d 981, 984 (Utah 1993), in which our supreme court stated that "a trial court may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Stricklan*, 2020 UT 65, ¶ 130 (cleaned up). But the court stated that the stepfather never argued to the

trial court that the stepdaughter's testimony was inherently improbable. *Id.* Accordingly, the court held that the stepfather's inherent improbability claim was not preserved. *Id.* ¶ 131.

¶26 Horn posits that *Stricklan* stands for the limited proposition that a motion arguing insufficiency of the evidence that is premised on a particular legal theory does not preserve another argument of insufficiency premised on a different legal theory. He asserts that because, here, Counsel "argued in very general terms that the evidence was insufficient," his motion "captured within it the inherent-improbability problem." And Horn further contends that a series of opinions from our court indicating that claims of inherent improbability must be specifically preserved have strayed from the preservation standard our supreme court provided, declaring that "[a]ny of this [c]ourt's case law to the contrary should be disregarded." We are not persuaded.

¶27 First, our caselaw requiring that criminal defendants specifically preserve an inherent improbability claim is consistent with *Stricklan* and with our general preservation requirements. As the *Stricklan* court emphasized, preservation requires a party to present an issue such that a court has an opportunity to rule on it. *See id.* ¶ 127. And a general motion asserting insufficient evidence does not present an issue of inherent improbability such that a court has an opportunity to rule on that issue. This is because the latter "goes far beyond what was argued" in the former. *State v. Skinner*, 2020 UT App 3, ¶ 29, 457 P.3d 421 (cleaned up). "In arguing that [a witness's] testimony should be excluded as inherently improbable, [a defendant] is not merely asking us to find that the evidence presented was insufficient. Instead, [the defendant] is asking us to disregard [the witness's] testimony in its entirety and then evaluate whether the State's evidence— without [that] testimony—is sufficient to support a conviction." *Id.* We do not and cannot expect trial courts to read into a general insufficiency argument (1) a claim that a particular—and unspecified—witness's testimony is inherently improbable, (2) a

request to disregard that testimony completely or in unspecified infected part, and (3) an argument that the evidence was insufficient without that testimony to support a verdict against the defendant. Hence, our cases requiring specific preservation of an inherent improbability claim have not run afoul of *Stricklan* or our guiding preservation principles but, rather, align with both.

¶28     Second, we are bound in any event by our previous caselaw on this point. "Under the doctrine of horizontal *stare decisis*, the first decision by a court on a particular question of law governs later decisions by the same court." *State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592 (cleaned up). "Therefore, one panel on the court of appeals owes great deference to the precedent established by a different panel on the court of appeals." *Id.* "However, our presumption against overruling precedent is not equally strong in all cases." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553. Thus, our supreme court has set forth "two broad factors" we must use to "distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down." *Id.* ¶ 22. Horn has not meaningfully engaged with these factors, and we are not otherwise convinced that our caselaw requiring specific preservation of an inherent improbability claim has "proven to be unpersuasive and unworkable, create[d] more harm than good, and [not] created reliance interests." *Legg*, 2018 UT 12, ¶ 10 (cleaned up). Accordingly, we decline to overrule that line of cases.

¶29     Given this, Horn's present argument is unpreserved. His directed verdict motion made no mention of inherent improbability, provided no argument that any witness's testimony was inherently improbable, and pointed to no authority supporting such a claim. Thus, Horn failed to present the issue to the trial court in a manner that provided the court with an opportunity to rule on the issue. In sum, his general argument

about insufficiency of the evidence did not preserve his later-formed inherent improbability claim. *See Skinner*, 2020 UT App 3, ¶ 29 ("A defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue. Because [the defendant] did not ever make such a request to the trial court, he did not properly preserve it for our review on appeal."); *see also State v. Cecala*, 2021 UT App 141, ¶ 28 n.5, 502 P.3d 790 ("To the extent that [the defendant] asks us to entirely disregard [one witness's] testimony, we agree with the State that [the defendant's] general motion for a directed verdict did not preserve that theory for appeal."); *State v. Lewis*, 2020 UT App 132, ¶ 45 n.5, 475 P.3d 956 ("Because [the defendant's] directed verdict motion was general, asserting only that the State failed 'to make a prima facie case on all three counts,' he did not preserve any specific inherent improbability claim."); *State v. Law*, 2020 UT App 74, ¶ 29, 464 P.3d 1192 ("[A] *Robbins* challenge to a witness's testimony must be specifically raised before the trial court to be preserved."); *State v. Doyle*, 2018 UT App 239, ¶¶ 2, 14, 437 P.3d 1266 ("[The defendant's] motion for a directed verdict . . . did not preserve his distinct claim that [the victim's girlfriend's] testimony should have been disregarded in its entirety as inherently improbable."); *State v. Gallegos*, 2018 UT App 112, ¶ 14, 427 P.3d 578 ("Where a motion for a directed verdict makes general assertions but fails to assert the specific argument raised on appeal, the directed verdict motion itself is insufficient to preserve the more specific argument for appeal." (cleaned up)).

## B.    Plain Error

¶30    Because Horn's inherent-improbability argument is unpreserved, we consider whether the trial court committed plain error by not determining sua sponte that Trooper 1's identification testimony was inherently improbable. "To

demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (cleaned up).

¶31 "Though [a] court must ordinarily accept the jury's determination of witness credibility, when the witness's testimony is inherently improbable, the court may choose to disregard it." *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288 (cleaned up). "[W]itness testimony is inherently improbable and may . . . be disregarded if it is (1) physically impossible or (2) apparently false." *Id.* The latter of these "include[s] circumstances where a witness's testimony is incredibly dubious," such as "where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion, and there is a complete lack of circumstantial evidence of guilt." *Id.* ¶ 18 (cleaned up).

¶32 Horn asserts that Trooper 1's identification testimony was inherently improbable because Trooper 1's "claim that he could clearly see and identify Mr. Horn as the driver of the car that morning directly contradicts everything he said about the conditions present when he saw the driver." Horn specifically notes that "it was dark and rainy out, the car had its headlights on, and both cars were traveling at high speeds in opposite directions." Horn also highlights that "[w]hile reviewing the dash camera footage of drivers in oncoming traffic at the trial, [Trooper 1] was unable to see the faces of the drivers." Horn asserts that "[t]hese drivers were in the exact same position as the driver of the silver car would have been—where [Trooper 1] claimed he saw [Horn] driving that morning."

¶33    Horn's argument is unavailing. The weather and lighting conditions did not themselves prevent drivers from observing details around them, as evidenced by the fact that various cars were driving safely on the road and at the intersection where Horn sped away from Trooper 1. And while headlights may obscure vision at some angles, they also help illuminate, and the fact that headlights were on does not render impossible Trooper 1 getting a clear look at Horn while the two drove past each other. Trooper 1 did not need a long time to observe Horn if he was able to get a clear look at him, and Trooper 1 testified that he saw Horn clearly. Although the combined speed of the two cars was high, it is not impossible for a driver to observe outside details while passing them at effectively one hundred miles per hour. Moreover, Trooper 1 testified that he received training in identifying drivers, so his skills in this area were presumably better than those of average drivers. Additionally, Trooper 1 testified that after identifying Horn and Swickard's car as the one described in the attempt to locate, he shifted his "focus and concentration" to "who was operating the vehicle," so he was able to negate other distractions while looking at Horn's face. Trooper 1 explained his motivation for paying close attention to the driver: he was concerned about a possible DUI and had experienced drivers switching seats before, so he wanted to be absolutely sure who was driving. Additionally, Trooper 1 testified that he "clearly saw facial hair" on the driver, and when Horn was taken into custody, he had facial hair that matched what Trooper 1 had seen.

¶34    The fact that Trooper 1 could not identify other drivers or Horn's license plate from the dashcam footage during trial does not offer Horn the support he desires. Trooper 1 testified that his camera's resolution was significantly poorer than what he could observe naturally with his eyes. And this was corroborated by the fact that Trooper 1 was able to see clearly enough on the day of Horn's arrest to read Horn's license plate and both enter it into his computer and relay it to dispatch. Trooper 1 noted that he was not

even able to tell from the dashcam footage that the plate was from Texas—a fact that was clear to Trooper 1 from one to two hundred yards away on the morning in question. In fact, that day Trooper 1 was able to see that the car's plates were expired, which further supports the difference in visibility in the dashcam footage versus in person. Furthermore, in addition to Trooper 1's testimony, Deputy testified similarly that what he could see with his eyes was "considerably better" than what he saw in his dashcam footage, and he also said he was able to see Horn's license plate clearly on the day in question, while it was "fuzzy" in the footage. This combined evidence provides strong support for Trooper 1's insistence that he saw Horn clearly. Under these circumstances, we do not conclude that Trooper 1's testimony was obviously "inherently contradictory." *See State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288 (cleaned up).

¶35 Moreover, Trooper 1 was not the "sole witness" to identify Horn as the driver of the subject car that morning, and this is not a case where "there is a complete lack of circumstantial evidence of guilt." *See id.* (cleaned up). Horn's and Swickard's statements both identified Horn as the sole operator of the car that morning. Although Horn insisted while being taken to jail that he was at a truck stop more than thirty miles from Trooper 1's position until about 8:00 a.m., that testimony is highly suspect given the attempt to locate that was issued around 7:20 a.m. and Trooper 1's subsequent ability to report the license plate number belonging to Horn and Swickard's car, as well as Trooper 1's timestamped dashcam footage showing the car at 7:24 a.m. But Horn did confirm that this car was with him throughout the morning and that no one else drove the car that morning. Swickard agreed that Horn was in the driver seat all morning. The agreement between Swickard and Horn that Horn was in the driver seat supports Trooper 1's identification testimony where Horn offered no evidence or argument to dispute that Trooper 1 spotted the car soon after the attempt to locate, captured footage of the car on his

dashcam, and was able to identify the car's license plate—and where Trooper 2 testified that he saw the car a little after 8:00 a.m. in Box Elder County.

¶36 Because of this, there was not "a complete lack of circumstantial evidence of guilt" here, *see id.* (cleaned up), and we cannot say that Trooper 1's testimony was obviously "incredibly dubious," *see id.* In fact, the evidence against Horn was quite strong, and it consistently pointed to him as the driver. Accordingly, Trooper 1's testimony was not inherently improbable, and the trial court did not plainly err by not sua sponte determining as much.

¶37 Horn's contention that the evidence was insufficient to support his conviction hinges on his argument that Trooper 1's identification testimony was inherently improbable and should have been disregarded. *See generally State v. Barnes*, 2023 UT App 148, ¶¶ 19–20, 542 P.3d 108 ("If we determine that the challenged testimony is inherently improbable, we then [disregard it] and determine if sufficient evidence remains under which a reasonable jury could have convicted. . . . On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence." (cleaned up)). Horn does not contend that the evidence was insufficient if Trooper 1's identification testimony is not disregarded. Thus, our conclusion that Trooper 1's identification testimony was not inherently improbable sounds the death knell for Horn's claim of error in the trial court's denial of his motion for a directed verdict based on insufficiency of the evidence. We therefore affirm the trial court's denial of Horn's motion for a directed verdict.

## II. Ineffective Assistance

¶38 We next consider Horn's ineffective assistance claims. He asserts that Counsel provided ineffective assistance in two

respects: (A) by failing to argue that this was a process-of-elimination case and (B) by failing to move to exclude Trooper 1's identification testimony—or, at minimum, to request a cautionary jury instruction related to it—under rule 617 of the Utah Rules of Evidence.

¶39    To succeed on either claim, Horn must first "show that [C]ounsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, Horn "must show that the deficient performance prejudiced [his] defense." *Id.* Horn "must establish both deficient performance and prejudice, and if either is lacking, the claim fails and this court need not address the other." *State v. Bush*, 2025 UT App 87, ¶ 20, 572 P.3d 449 (cleaned up), *cert. denied*, Jan. 2, 2026 (No. 20250889).

¶40    To demonstrate deficient performance, Horn "has the burden to overcome a strong presumption that Counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Hunter*, 2021 UT 44, ¶ 68, 496 P.3d 119 (cleaned up). "Deficient performance is not determined in a vacuum; rather, it involves asking whether the strategy Counsel employed was that of a reasonable, competent lawyer . . . ." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). "The ultimate question is always whether, considering all the circumstances, Counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (cleaned up).

A.    Process of Elimination

¶41    Horn argues that "[t]he prosecution pursued a case that involved a process of elimination, and it should have been argued to both the trial court and the jury as such." Horn contends that Counsel should have argued this theory either as part of his directed verdict motion or else in closing argument and that the failure to do either constituted deficient performance. We disagree.

¶42 When the State employs a process-of-elimination theory, it assumes the burden of "eliminat[ing] all other possible suspects" who could have committed the crime. *State v. Meyer*, 2023 UT App 65, ¶ 39, 532 P.3d 583; *see also id.* ¶ 36 ("If the prosecution intends to obtain a conviction by the process of elimination by showing that no one else but the defendant could have been guilty, the burden is upon it to show that there was no one else in the other room." (cleaned up)). But here the State did not present its case through a process of elimination. Its theory was not that "no one else but the defendant could have been guilty," *id.* ¶ 36 (cleaned up), but, rather, that it could directly prove Horn was the driver of the car. The State did not need to approach the case as a process-of-elimination case because Trooper 1 affirmatively identified Horn and testified that Horn was the driver he saw. The State's theory would have been different if Trooper 1 had not seen the driver but had, instead, only been able to identify the car and license plate. Under such circumstances, the State would have needed to convince the jury—based solely on circumstantial evidence—that no one but Horn could have been driving. But because Trooper 1 testified that he saw Horn driving the car, the State was not required to prove that Swickard—or anyone else—was not driving the car. Therefore, Counsel did not perform deficiently by not framing the State's case as a process-of-elimination case, and this ineffective assistance claim fails.

B.     Rule 617

¶43 Finally, Horn asserts that Counsel provided ineffective assistance related to rule 617 of the Utah Rules of Evidence. Horn contends that Counsel should have either moved to exclude Trooper 1's identification of Horn under rule 617 or else requested a cautionary jury instruction under this rule. We consider each contention in turn.

1.    Exclusion

¶44    Rule 617(b) of the Utah Rules of Evidence states,

> In cases where eyewitness identification is contested, the court shall exclude the evidence if the party challenging the evidence shows that a factfinder, considering the factors in this subsection (b), could not reasonably rely on the eyewitness identification. In making this determination, the court may consider, among other relevant factors, expert testimony and other evidence on the following:
>
> (1) Whether the witness had an adequate opportunity to observe the suspect committing the crime;
>
> (2) Whether the witness's level of attention to the suspect committing the crime was impaired because of a weapon or any other distraction;
>
> (3) Whether the witness had the capacity to observe the suspect committing the crime, including the physical and mental acuity to make the observation;
>
> (4) Whether the witness was aware a crime was taking place and whether that awareness affected the witness's ability to perceive, remember, and relate it correctly;
>
> (5) Whether a difference in race or ethnicity between the witness and suspect affected the identification;
>
> (6) The length of time that passed between the witness's original observation and the time the witness identified the suspect;

(7) Any instance in which the witness either identified or failed to identify the suspect and whether this remained consistent thereafter;

(8) Whether the witness was exposed to opinions, photographs, or any other information or influence that may have affected the independence of the witness in making the identification; and

(9) Whether any other aspect of the identification was shown to affect reliability.

Horn argues, "When applying the [foregoing] factors to [this] case, it becomes clear that [Trooper 1's] testimony should have been excluded under rule 617." We disagree.

¶45 These factors largely either cut against exclusion here or are countered by facts supporting the reliability of Trooper 1's identification. We examine each factor below.

(1) <u>Adequate Opportunity to Observe:</u> It is true that Trooper 1 had only a few seconds to observe the driver and that the cars passed each other at a high combined speed. However, identifying outside details is feasible at this speed, and at the time the cars passed each other, they were quite close to one another. Additionally, Trooper 1 testified that he saw the subject car one to two hundred yards away and then shifted his focus to the driver, so he spent the full remaining time looking at the driver rather than at other things. Trooper 1 also testified that he saw Horn clearly, and his notice of Horn's facial hair corroborated this.

(2) <u>Impaired or Distracted Attention:</u> Horn contends that the weather and lighting conditions made it impossible for Trooper 1 to see him clearly. While the weather may have been a general distraction on the morning of these events,

it was not so bad that Trooper 1 or other drivers were unable to see their surroundings. We are unwilling to adopt the position that observations made on rainy, overcast days are inherently unreliable, and Trooper 1's dashcam footage shows that there was passable visibility that morning. And again, Trooper 1 testified that after identifying the car, he was able to shift his "focus and concentration" to "who was operating the vehicle," thereby reducing the effects of other distractions and increasing his level of attention to Horn's face. And Trooper 1 was able to see clearly enough to read Horn's license plate number and see that his registration was expired. Thus, the weather was not sufficiently distracting that it rendered Trooper 1's observation unreliable.

(3) <u>Witness's Capacity to Observe:</u> There is no contention that Trooper 1 lacked the physical or mental acuity to observe Horn. Furthermore, Trooper 1's training increased his capacity to make such observations. In this respect, Trooper 1's identification of Horn may well have been more reliable than if a layperson had made the observation.

(4) <u>Witness's Awareness that a Crime Was Occurring:</u> Trooper 1 was aware that Horn and Swickard's car matched the one described in the attempt to locate, which car had been described as "not maintaining its lane" and "going . . . towards oncoming traffic." Because Trooper 1 was a trained officer, this knowledge likely positively impacted his ability to perceive, recall, and relate his observations because he knew he would need to be accurate to investigate the driver and pursue justice.

(5) <u>Difference in Race or Ethnicity:</u> Horn has not argued that this factor negatively impacted Trooper 1's identification, and the record evidence does not support a finding that it did.

(6) <u>Time Between Observation and Identification:</u> While several hours passed from the time Trooper 1 saw Horn driving to the time Trooper 1 took Horn into his custody, this was not a great length of time. We do not think it likely that Trooper 1 forgot what he observed, particularly given his communication with other officers and continued involvement in the case. Also, there is no suggestion that Horn materially changed his appearance during this window such that Trooper 1 could not accurately identify him.

(7) <u>Witness's History of Identifying or Failing to Identify the Suspect:</u> Trooper 1 identified Horn on Facebook before meeting him in person. Horn suggests that this should negatively impact our assessment of Trooper 1's identification, but that is not necessarily true. Trooper 1 was able to match his memory of Horn's face with Horn's pictures on Facebook, thereby identifying Horn before meeting him in person. And Trooper 1 consistently maintained from that point on that Horn was the person he saw driving.

(8) <u>Outside Information or Influence:</u> On the other hand, Trooper 1's exposure to Horn's Facebook photos—after learning Horn's first name from Deputy—may have affected the independence of Trooper 1's later in-person identification of Horn.

(9) <u>Other Possible Factors:</u> We are not convinced that Trooper 1's identification was otherwise unreliable.

¶46 Overall, then, the factors do not support exclusion here. Only factor eight falls clearly in Horn's favor, while factors three, four, five, and seven support the reliability of Trooper 1's identification and factors one, two, six, and nine are best classified as neutral. The circumstances of high speed and rainy, overcast

driving conditions are negated by Trooper 1's testimony as to his training, focus on the driver, and ability to see Horn clearly. And while factor eight could support exclusion, given that there is no dispute that Horn and Swickard's car was the one Trooper 1 saw and recorded in the morning, that the car was registered to Horn and Swickard, and that both Horn and Swickard said Horn was in the driver seat all morning, we think any risk of Trooper 1 misidentifying Horn as the driver is negligible. Accordingly, we are persuaded that a factfinder could have reasonably relied on Trooper 1's eyewitness identification. Therefore, had Counsel made a motion to exclude Trooper 1's testimony under rule 617, it is unlikely that the court would have granted the motion, so Counsel did not perform deficiently in choosing to forgo the motion. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)).

2.      Cautionary Jury Instruction

¶47     Finally, Horn asserts that Counsel provided ineffective assistance by not requesting a cautionary jury instruction under rule 617. Rule 617(f) states, "When the court admits eyewitness identification evidence, the court may, and shall if requested, instruct the jury consistent with the factors in subsections (b) and (c) and other relevant considerations." Utah R. Evid. 617(f). Such a cautionary instruction is often referred to as "a *Long* instruction." *See State v. Long*, 721 P.2d 483, 492 (Utah 1986) (directing trial courts to give a cautionary jury instruction on the potential unreliability of eyewitness identifications "whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense").

¶48     As a starting point, we note that our supreme court has rejected the notion "that in every case in which eyewitness

identification is an issue, trial counsel's performance is per se deficient if a cautionary instruction is not requested." *State v. Maestas*, 1999 UT 32, ¶ 32 n.2, 984 P.2d 376. Instead, trial counsel's performance must be evaluated in light of the facts of the particular case. *See id.*

¶49 Instructively for purposes of ineffective assistance of counsel in this context, our supreme court concluded in *State v. Hunter*, 2021 UT 44, 496 P.3d 119, that although the eyewitness identification testimony in that case was susceptible to attack under some of the rule 617 factors, defense counsel did not perform deficiently by not requesting a *Long* instruction because other factors would have bolstered the eyewitness identification testimony. *See id.* ¶¶ 68–95. In *Hunter*, two police officers "set up surveillance to look for drug activity near a downtown homeless shelter." *Id.* ¶ 5. They "conducted their surveillance operation in two adjacent, second-story office rooms in a building just over a hundred yards from the shelter" and "used binoculars to observe the goings on" below. *Id.* (cleaned up). At one point, they observed what they believed to be a drug transaction between two men, and they radioed officers on the street to inform them of what they had seen. *See id.* ¶¶ 6, 11, 19. Based on the surveillance officers' real-time identification of the defendant as the seller in the transaction they had witnessed, the defendant was arrested and found to have methamphetamine in his possession. *See id.* ¶¶ 19, 22–23. He was subsequently charged with "distribution of or arranging to distribute a controlled substance." *Id.* ¶ 25. However, the defendant maintained that "the police got the wrong man." *Id.* ¶ 1. He admitted that "he possessed methamphetamine," but he said he was "not the same man the police saw *distributing* methamphetamine." *Id.* A jury nevertheless convicted the defendant of distributing or arranging to distribute a controlled substance, based in part on eyewitness identification testimony by the surveillance officers. *See id.*

¶50 On appeal to this court, the defendant asserted ineffective assistance because his trial counsel did not request a *Long* instruction. *See id.* ¶ 34. Instead, trial counsel had "presented a theory of mistaken identification in his opening and closing arguments" and had "cross-examined the prosecution's witnesses about weaknesses, inconsistencies, and gaps in their testimony." *Id.* ¶ 2. We rejected the ineffective assistance claim, and—on certiorari review—the supreme court rejected it as well. *See id.* ¶¶ 4, 34–35. The supreme court held that "[a] competent attorney, on the facts of [that] case, could reasonably conclude that a *Long* instruction might backfire by causing the jury to think the officers' identification testimony was more reliable than they would otherwise think without the instruction." *Id.* ¶ 4. The court explained that "[a] reasonable, competent lawyer could have looked at the factors that a *Long* instruction would have highlighted and determined that such an instruction would be unhelpful, or even hurtful, to his [or her] client's defense." *Id.* ¶ 77 (cleaned up). Thus, the court said, "[c]ompetent counsel could have reasonably concluded that using opening and closing arguments and cross-examinations to highlight specific weaknesses in the State's case was the safer route." *Id.*

¶51 We reach the same conclusion here. For the same reasons given above, *see supra* ¶¶ 45–46, more relevant factors fell in favor of the reliability of Trooper's identification than fell against it, and several facts that suggested unreliability were countered by facts supporting reliability. While requesting a cautionary instruction may have drawn the jury's attention to the weather conditions, speed of the cars, and the potentially suggestive influence on Trooper 1 of seeing Facebook photos of Horn, thus aiding Horn's defense, the instruction would have likely bolstered Trooper 1's testimony regarding the other factors. Specifically, the instruction would have invited the jury to place extra weight on the evidence that Trooper 1 was trained to make these types of observations, focused his attention on observing Horn's face, got a clear view of

Horn's face as he passed by, noticed that Horn had facial hair, could see clearly enough despite the weather and lighting conditions to read out Horn's license plate number and tell his plates were expired, and never wavered in his identification of Horn. Thus, Counsel could—like defense counsel in *Hunter*—have reasonably decided that a cautionary instruction would have been "unhelpful, or even hurtful, to his client's defense." 2021 UT 44, ¶ 77; *see also Long*, 721 P.2d at 492 n.5 (recognizing, based on study data at the time, that when an eyewitness identification instruction is "given in conjunction with strong eyewitness testimony, it bolster[s] jurors' beliefs in the correctness of the identification"). Also like defense counsel in *Hunter*, Counsel could have reasonably chosen to instead use "opening and closing arguments and cross-examination[] to highlight specific weaknesses in the State's case." *See* 2021 UT 44, ¶ 77.

¶52 And it is evident from the record that this is what Counsel did, apparently deeming it "the safer route." *See id.* For example, during cross-examination, Counsel got Trooper 1 to acknowledge that Trooper 1's and Horn's combined speeds were about one hundred miles per hour, revealed Trooper 1's inability to identify any drivers from the dashcam footage, and exposed Trooper 1's failure to identify or remember whether anyone besides Horn was in the car. And in closing, Counsel argued that there were problems with Trooper 1's identification of Horn, including that the sun had just risen, that "it was raining and overcast," that headlights from oncoming traffic would have prevented Trooper 1 from seeing oncoming drivers, that the cars were going too fast for Trooper 1 to identify the driver, and that Trooper 1 did not see if there was anyone else in the car. Counsel also suggested that Trooper 1's identification testimony was unreliable because memory is malleable. In other words, Counsel did grapple with the issues affecting the reliability of Trooper 1's identification testimony; he simply did so through cross-examination and

argument to the jury, where he did not have to acknowledge the factors supporting Trooper 1's testimony.

¶53    For these reasons, Horn has not overcome the strong presumption that Counsel's conduct fell within the wide range of reasonable professional assistance. *See id.* ¶ 68. We therefore conclude that Counsel did not render deficient performance by not requesting a cautionary instruction.

CONCLUSION

¶54    Horn's argument that Trooper 1's identification testimony was inherently improbable was not preserved, and the trial court did not plainly err in failing to disregard Trooper 1's testimony on this ground. And because Trooper 1's identification testimony rightly was not disregarded, the trial court also correctly denied Horn's directed verdict motion. Finally, Counsel did not perform deficiently by failing to argue that this was a process-of-elimination case, to move to exclude Trooper 1's identification testimony under rule 617, or to request a cautionary jury instruction under the same rule. We affirm.

————————